NATIONS TITLE INSURANCE OF NEW YORK, INC., et al., Appellants,

v.

BERTRAM et al., Appellees.

[Cite as *Nations Title Ins. of New York, Inc. v. Bertram* (2000), 140 Ohio App.3d 157.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 18078.

Decided June 9, 2000.

158

*Schottenstein, Zox, & Dunn Co., L.P.A.* and *Daniel R. Swetnam,* for appellant United Companies Lending Corporation and primary counsel for appellants Fidelity National Title Insurance Company of New York; Nations Title Insurance of New York, Inc.; Stewart Title Insurance Company; Guarantee Title and Trust Company; and Stanley J. Cohen, Receiver.

*David M. Rickert,* for appellant Farmers State Bank of New Madison, Ohio.

*Roger J. Makley* and *Dina M. Cary,* for Margaret Bertram Hayes and Christopher Hayes.

*Roger E. Luring,* for Secured Equity Title Agency Corporation.

*James Goubeaux,* for appellees William M. Bertram and Secured Equity Title Agency Corporation.

*Craig A. Dynes,* for Jennifer Bertram.

WOLFF, Judge.

Nations Title Insurance of New York, Inc., Fidelity National Title Insurance Company of New York, Stewart Title Insurance Company, Guarantee Title and Trust Company, Stanley J. Cohen, Receiver, and United Companies Lending Corporation (hereinafter referred to collectively as "Nations Title") appeal from a decision of the Montgomery County Court of Common Pleas which awarded summary judgment to Farmers State Bank of New Madison, Ohio ("FSB").

Secured Equity Title and Appraisal Corporation ("Secured Equity") was an Ohio corporation which maintained its principal office in Greenville, Ohio. William H. Bertram, Jr. was the sole shareholder, officer, and director of Secured Equity. Secured Equity performed various activities for Nations Title, including acting as a title insurance agent, closing loans, and making loan disbursements to home improvement loan borrowers.

In connection with its business, Secured Equity opened and maintained an escrow account at FSB. The escrow account was opened by Bertram as an individual account captioned as "William H. Bertram, Jr. Trust Agent for Secured Equity Title." The money in the escrow account represented disbursements from Nations Title for loan borrowers. Secured Equity had separate operating and savings accounts at FSB, as well as another escrow account at another bank. Bertram also operated his own law firm and had served as an attorney for FSB for twenty-five years. Bertram was a friend to Richard Shives, the president of FSB.

During the early 1990s, Secured Equity's business grew rapidly. As a result, the escrow account usually maintained a balance between $1,000,000 and $2,000,000, and at times reached up to $4,000,000. The escrow account was "extremely labor intensive" for FSB employees, with a lot of activity, including 4,000 to 5,000 checks written from the escrow account each month, $10,000,000 deposited into the escrow account each week, and a large volume of wire transfers of funds to and from the account. The escrow account was the most active account at FSB in 1995 and 1996.

In December 1994, Bertram was contacted by an investment broker who offered Bertram the opportunity to purchase some high risk securities which were supposed to make Bertram a lot of money in a short period of time. Bertram invested his personal money with the investment brokerage firm. After his first investment was quite successful, he invested more money with the firm.

In February 1995, Bertram decided to invest money from Secured Equity's escrow account in the high risk securities. Bertram directed FSB to send wire transfers of funds from the escrow account to the investment firm's clearinghouse. Between February and June 1995, Bertram sent eleven wire transfers of

funds, totaling over $3,000,000, from the escrow account to the investment brokerage firm.

By August 1995, Bertram's investments had suffered a severe decline in value and Bertram had lost about $1,000,000. As a result of the wire transfers, the escrow account's balance had declined and Bertram became concerned. He approached Richard Shives and requested that FSB allow him to have overdraft protection on the escrow account, to prevent checks written from the escrow account from ever being returned for insufficient funds. When asked why he needed such protection, Bertram explained that some of the funds that Secured Equity was receiving from its lenders, such as Nations Title, were not being deposited immediately, and that the loans were being closed with the borrowers before the funds to cover such loans were getting deposited into the escrow account. FSB agreed to give Secured Equity $500,000 in overdraft protection. FSB did not request any type of security for the overdraft protection. Bertram directed FSB to contact Secured Equity as soon as the overdraft protection was drawn upon, so that Secured Equity could take funds to FSB to cover the overdraft protection as quickly as possible. Bertram also directed FSB to remove funds from the escrow account to repay overdraft protection that had been utilized any time that there was a deposit into the escrow account.

Between August 1995 and March 1996, Bertram made nine additional wire transfers of funds, totaling over $1,750,000, from the escrow account to two investment brokerage firms. In April 1996, Bertram became concerned that $500,000 in overdraft protection might not be enough to cover the daily activity of the escrow account, so he asked FSB to increase the overdraft protection to $700,000. FSB agreed to increase the overdraft protection as requested on April 23, 1996.

During April and May 1996, the overdraft protection was utilized five times. On April 19, 1996, FSB gave the escrow account $197,800 in overdraft protection. On April 22, 1996, FSB gave the escrow account $302,200 in overdraft protection. Both of these amounts plus interest were repaid to FSB on April 23, 1996. On that same day, FSB gave the escrow account $287,900 in overdraft protection. That amount plus interest was repaid to FSB on April 26, 1996. On May 20, 1996, FSB gave Secured Equity $155,900 in overdraft protection. That amount plus interest was repaid to FSB on May 21, 1996. On May 24, 1996, FSB gave the escrow account $161,600 in overdraft protection. On May 28, 1996, that amount plus interest was repaid to FSB.

As instructed, when the overdraft protection was utilized, an FSB employee would call Secured Equity. On one occasion, a Secured Equity employee brought approximately $2,000,000 in checks to deposit into the escrow account within forty minutes after Secured Equity had been notified that the overdraft protection had

been utilized. On another occasion, checks totaling $800,000 from the desk of Ann Light, Secured Equity's accountant, were taken by another Secured Equity employee to FSB to repay the overdraft protection within a short time after Secured Equity had been notified.

On May 24, 1996, the Friday before Memorial Day weekend, Bertram called Richard Shives and informed him that he had made some investments with the money from the escrow account and that Secured Equity's lenders had discovered his defalcations. Bertram stated that Nations Title wanted him to sell the investments and that the investments were not worth the amount that he had paid for them, so there "would be a short fall on them." On Tuesday, May 28, 1996, Richard Shives and his son, David, the executive vice president, CEO, and a cashier at FSB, attended a meeting at Bertram's house, where they learned of the "magnitude" of the money that was involved and how much could be lost when the stocks were sold. The exact amount of the investments' market value was still unknown, however, at that time.

On that same day, money was deposited into the escrow account and FSB automatically withdrew the money to repay the outstanding overdraft protection that had been given to the escrow account. FSB then terminated the overdraft protection for the escrow account.

On August 7, 1997, Nations Title filed a "Second Amended and Supplemental Complaint" against FSB and other defendants. In the complaint, Nations Title alleged, *inter alia*, that FSB had owed them a duty to act in good faith and to exercise care to detect Bertram's breaches of his fiduciary duty and that FSB had breached those duties by allowing Bertram to transfer escrow account funds for improper purposes.

On April 1, 1998, FSB moved for summary judgment, arguing that FSB "was an innocent pawn in Secured Equity's alleged illegal activities" and that FSB was not liable to Nations Title as a matter of law. On April 17, 1998, Nations Title filed a memorandum in opposition to FSB's motion for summary judgment. On August 7, 1998, the trial court granted FSB's motion for summary judgment. On September 21, 1998, the trial court overruled Nations Title's motion for reconsideration. On November 9, 1999, the remaining claims, counterclaims, and cross-claims were dismissed with prejudice, making the trial court's August 7, 1998 decision a final appealable order. On November 30, 1999, Nations Title filed a notice of appeal of the trial court's August 7, 1998 decision.

Nations Title advances three assignments of error on appeal.

"I. The trial court erred by granting summary judgment on the issue [of] whether, under the Uniform Fiduciaries Act, Farmers State Bank acted in bad faith in its dealings with the escrow account[.]"

Nations Title argues that the trial court erred when it concluded that there was no genuine issue of material fact regarding whether FSB had acted in bad faith in its dealings with Bertram and Secured Equity's escrow account.

Our review of the trial court's decision to grant summary judgment to FSB is *de novo*. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841, 843, discretionary appeal not allowed (1998), 81 Ohio St.3d 1432, 689 N.E.2d 51. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343, 345; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 65–66, 8 O.O.3d 73, 74, 375 N.E.2d 46, 47. The moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claim." *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 293, 662 N.E.2d 264, 274. If the moving party satisfies its initial burden, "the nonmoving party then has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Id.;* see Civ.R. 56(E).

■ The parties agree that this case is governed by the Uniform Fiduciary Act, codified by the Ohio legislature at R.C. 1339.03 through 1339.13 ("UFA"). The UFA "covers all sorts of situations where fiduciaries * * * deal with the funds of their principals." *Macon Cty. v. Edgcomb* (1995), 274 Ill.App.3d 432, 435, 211 Ill.Dec. 136, 139, 654 N.E.2d 598, 601. It "was developed to facilitate commercial transactions, by relieving those who deal with authorized fiduciaries from the duty of ensuring that entrusted funds are properly utilized for the benefit of the principal by the fiduciary." *Master Chem. Corp. v. Inkrott* (1990), 55 Ohio St.3d 23, 26, 563 N.E.2d 26, 29. The UFA "shields a bank from liability when the bank knows that the individual is acting for the benefit of another." *Id.* at 27, 563 N.E.2d at 30. Thus, the UFA "place[s] the burden on the principal to employ honest fiduciaries." *Ohio Cas. Ins. Co. v. Bank One* (Sept. 5, 1996), N.D.Ill. No. 95 C 6613, unreported, 1996 WL 507292.

■ R.C. 1339.08 states as follows:

"If a deposit is made in a bank to the credit of a fiduciary as such, the bank may pay the amount of the deposit or any part thereof upon the check of the

fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in drawing the check or with knowledge of such facts that its action in paying the check amounts to bad faith.

"If such a check is payable to the drawee bank and is delivered to it in payment of or as security for a personal debt of the fiduciary to it, the bank is liable to the principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check."

Wire transfers are treated the same as checks under the UFA. *State v. Warner* (1990), 55 Ohio St.3d 31, 59–63, 564 N.E.2d 18, 44–47, certiorari denied (1990), 499 U.S. 961, 111 S.Ct. 1584, 113 L.Ed.2d 649. R.C. 1339.08 corresponds to Section 7 of the UFA and such section was written " 'to facilitate banking transactions by relieving a depository, acting honestly, of the duty of inquiry as to the right of its depositors, even though fiduciaries, to check out their accounts.' " *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.* (1988), 69 Haw. 523, 529, 751 P.2d 77, 81 quoting *Transport Trucking Co. v. First Natl. Bank* (1956), 61 N.M. 320, 325, 300 P.2d 476, 479.

We are unable to locate any case from an Ohio court which construes R.C. 1339.08. Cases from other jurisdictions which construe statutes similar to R.C. 1339.08 are persuasive, however, as the UFA explicitly states that it "shall be so construed so as to effectuate [its] general purpose[,] which is to make the law of [Ohio] uniform with the law of those states which enact similar legislation." R.C. 1339.12. Further, the Supreme Court of Ohio construed R.C. 1339.09 in *Inkrott, supra.* R.C. 1339.08 addresses the liability of a bank upon which an instrument was drawn when the account from which such instrument was drawn was in the name of the fiduciary as such. R.C. 1339.09 addresses the liability of a bank upon which an instrument was drawn when the account from which such instrument was drawn was in the name of the principal. See *Macon Cty.*, 274 Ill.App.3d at 435–436, 211 Ill.Dec. at 139, 654 N.E.2d at 601. The language in R.C. 1339.08 and 1339.09 is quite similar. Both statutes state that a bank which deals with a fiduciary is not liable unless it pays the check with actual knowledge that the fiduciary is committing a breach of his fiduciary obligation, with knowledge of such facts that its action in paying the check amounts to bad faith, or the check is payable to the bank and is delivered in payment of a personal debt of the fiduciary. Since the two statutes contain similar language, we will construe R.C. 1339.08 pursuant to the supreme court's interpretation of R.C. 1339.09 in *Inkrott.* We keep in mind, however, that under R.C. 1339.09, the complaining principal itself has an account at the bank and thus is the bank's customer. Under R.C. 1339.08, the complaining principal does not have an account at the bank, but

rather the fiduciary has an account at the bank in his name as such and thus the fiduciary is the bank's customer and the complaining principal is not the bank's customer but rather is a customer of the bank's customer.

Construing R.C. 1339.09, the *Inkrott* court stated:

"In an action against a bank for wrongful payment of a check deposited, where the payee-bank presents the defense that it dealt with an individual knowing him to be a fiduciary, the drawer-depositor, in order to successfully maintain such action, must show that [1] the bank had actual knowledge of the fiduciary's breach of the fiduciary obligation, or [2] that the bank had knowledge of such facts that its actions in paying the checks amounted to bad faith, or [3] that the fiduciary was indebted to the bank and the funds were applied to that indebtedness." *Inkrott*, at syllabus.

Nations Title argues, pursuant to the second alternative in *Inkrott*, that the trial court erred in granting summary judgment because there was a genuine issue regarding whether FSB had knowledge of such facts that its actions in paying the checks amounted to bad faith.

The UFA does not define "bad faith" but does state that "good faith" "includes an act when it is in fact done honestly." R.C. 1339.03(E). " 'In determining whether the bank acted with bad faith, "courts have asked whether it was 'commercially' unjustifiable for the payee to disregard and refuse to learn facts readily available." ' " *Inkrott*, 55 Ohio St.3d at 28, 563 N.E.2d at 31 (quotations omitted). " 'The facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction.' " *Id.*

It is important to note that mere negligence on the part of the depository bank is insufficient to amount to bad faith. *Trenton Trust Co. v. Western Sur. Co.* (Mo.1980), 599 S.W.2d 481, 492; see *Inkrott*, 55 Ohio St.3d at 28, 563 N.E.2d at 31. The distinction between bad faith and negligence is that, unlike negligence, bad faith is willful. *Trenton Trust Co.*, 599 S.W.2d at 492. " 'The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith * * *, unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction,—that is to say, where there is an intentional closing of the eyes or stopping of the ears.' " *Id.*

Nations Title sets forth five points in support of its argument that there was a genuine issue as to whether FSB acted in bad faith. First, it argues that FSB had reason to suspect the defalcation in the escrow account because the wire transfers from the escrow account were to investment brokerage firms and listed either Bertram or Secured Equity as the beneficiary of the transfers instead of

listing third parties as the beneficiaries. Second, it points out that FSB knew that although Secured Equity's business was growing rapidly, the escrow account had had declining average daily balances. Third, it argues that Bertram's request for overdraft protection on an escrow account should have raised questions because an escrow account is "merely a 'wash account.'" Fourth, it argues that with minimal investigation, FSB would have discovered that Bertram's stated reason for needing the overdraft protection was false. Fifth, it points out that FSB violated its own loan policies when it allowed the escrow account to have overdraft protection.

In granting FSB's motion for summary judgment, the trial court found that, because the facts and circumstances indicated that the escrow account at FSB had been very active, and because "it is not accepted banking practice to inquire into each transfer" when a fiduciary has authority to transfer escrow funds, FSB's "actions were not 'commercially unjustifiable' in light of the circumstances surrounding the account" and thus its actions had not been in bad faith.

Before beginning a discussion of the five points that Nations Title raises in support of its argument that there was a genuine issue as to whether FSB acted in bad faith, we must discuss the applicability of the holding in *Inkrott* to this case. Nations Title argues that "if the [Supreme Court of Ohio] concluded that the 'procedure' utilized by Toledo Trust was sufficient to **enter judgment against Toledo Trust as a matter of law** on the issue of bad faith, then the evidence presented by [Nations Title] in this case * * * was more than enough to demonstrate a genuine issue of material fact as to that same issue." (Emphasis *sic*.)

In *Inkrott*, Larry Inkrott was responsible for paying the tax obligations of his employer, Master Chemical Corporation. *Inkrott*, 55 Ohio St.3d at 23, 563 N.E.2d at 27. Toledo Trust served as a depository bank for federal tax payments. *Id.* On three occasions, Inkrott prepared checks payable to Toledo Trust and obtained the appropriate signatures on such checks by representing to the signing individual that the check was going to be used to pay the corporation's taxes. *Id.* at 23, 563 N.E.2d at 27. Inkrott then took the checks to Toledo Trust and deposited them into an account which he personally controlled titled, "H.Y. Investment Fund." *Id.* The funds from these checks were later lost through Inkrott's dealings in the commodities market. *Id.* at 24, 563 N.E.2d at 27.

The *Inkrott* court held that Toledo Trust had not had actual knowledge that Inkrott was defrauding the company and that Inkrott had not used the funds to pay a debt that he had owed to the bank. *Id.* at 28, 563 N.E.2d at 31. The court entered judgment against Toledo Trust, however, after finding that it had "established a procedure where a transfer from one corporate account to another

[corporate account] would be presumed correct and would not be questioned * * * [and that in] an age of white-collar crime, it [was] more than negligent for [the] bank to make such a presumption in the development of its policies when dealing with fiduciaries presenting checks payable to the bank." *Id.* The court concluded that "it [was] commercially unjustifiable [*i.e.* bad faith] for Toledo Trust to institute a procedure permitting this type of theft to occur." *Id.* Thus, in *Inkrott,* the checks were made payable to Toledo Trust, but Toledo Trust allowed them to be deposited into Inkrott's personal account.

In the case before us, Bertram told FSB to send wire transfers of funds to investment brokerage firms, and FSB sent the wires as directed. During oral argument, Nations Title argued that its case was similar to *Inkrott* because FSB had established a procedure where it would allow wire transfers of funds in unlimited amounts to anywhere in the country. Nations Title argued that such procedure was, like the procedure in *Inkrott,* commercially unjustifiable. We cannot agree. The bank in *Inkrott* allowed Inkrott to deposit funds into his personal account without question, when such checks were written to the bank. In this case, FSB sent the wire transfers of funds as it was directed.

Further, as we stated, *supra,* the purpose of the UFA was to facilitate commercial transactions. We do not believe that FSB's policy of allowing wire transfers of funds in unlimited amounts to any place is commercially unjustifiable. In her deposition, Karron Hoskins, vice president and head of operations at FSB, testified that she had sent "lots of large wires" in amounts in excess of $245,000 for FSB customers. If we were to hold that FSB's policy was commercially unjustifiable, we would be encouraging banks to develop a policy to police high dollar amount wire transfers of funds and such a policy would not facilitate commercial transactions. As one court has stated:

"To require the [b]ank to inquire of the circumstances of every trust [or escrow account] transaction where 'suspicious circumstances' exist would bring the wheels of commerce to a halt. Banks would be reluctant to allow [such] accounts. The purposes of the [UFA], both nationally and as adopted by [our state], would be thwarted." *Richards v. Platte Valley Bank* (C.A.10, 1989), 866 F.2d 1576, 1583.

In their reply brief, Nations Title argues that this case is similar to *Inkrott* because in this case, FSB "created elaborate loan procedures, *and then proceeded to violate its own procedures* in connection with the overdraft protection." (Emphasis *sic.*) In *Inkrott,* the bank had established a procedure where transfers between corporate accounts would not be questioned and that procedure, in itself, allowed Inkrott to embezzle money from the corporate account. In the case before us, FSB created a procedure to follow when granting loans, but such procedure, in itself, did not allow Bertram to commit his defalcations. In fact,

notably, all of Bertram's defalcations from the escrow account took place before the overdraft protection was ever utilized. Thus, the case before us is distinguishable from *Inkrott.*

■ Nations Title first argues that there was a genuine issue as to whether FSB acted in bad faith in that FSB had reason to suspect the defalcation in the escrow account because the wire transfers from the escrow account were to investment brokerage firms and listed either Bertram or Secured Equity as the beneficiary of the transfers instead of listing third parties as the beneficiaries. Of the twenty wire transfers of funds, seventeen were sent to the Bank of America to be credited to J.B. Oxford & Co., two were sent to the Bank One of Colorado to be credited to Hanifen Imhoff Clearing Corp., and one appears to have been sent to the Bank of America to be credited to Adler, Coleman Clearing Corp. The funds that arrived at J B Oxford & Co. were to be further credited to an account titled, "Secured Equity Title & Appraisal." The funds that arrived at Hanifen Imhoff Clearing Corp. were to be further credited to Duke & Company, Inc. as a "payoff" for "Secured Equity Title Agency[-]William Bertram." It is unclear where the funds that went to Adler, Coleman Clearing Corp. were further credited, as the "Information for Wire Transfer of Funds" form for that transaction does not appear to be in the record. In her deposition, Hoskins testified that she had not recognized the names on the wire transfers to be names of investment brokerage firms or clearinghouses.

In an affidavit, Hoskins stated that between January 1995 and July 1996, 2,823 deposits were made into the escrow account and 42,035 withdrawals were made from that account. Between "1994 and May 1996," 256 withdrawals from the escrow account were in excess of $100,000, with the largest withdrawal being made on August 19, 1994 in the amount of $700,000. The twenty withdrawals from the escrow account which were sent to the investment brokerage firms were made between February 1995 and March 1996 and were in amounts as follows: $245,515; $151,875; $234,385; $681,260; $393,770; $221,885; $107,832.50; $62,520; $187,510; $371,273; $355,795; $30,628; $250,000; $24,500; $221,265; $196,030; $200,703; $190,915; $400,000; and $273,020. Thus, there was nothing unusual about these numbers to draw attention to them.

After reviewing these facts, we do not believe that the fact that the twenty wire transfers were to investment brokerage firms or that they listed Bertram or Secured Equity as a beneficiary created a genuine issue regarding whether FSB acted in bad faith. See *Heffner v. Cahaba Bank & Trust Co.* (Ala.1988), 523 So.2d 113, 115 (concluding that neither "the amount and number of transactions carried out on an account containing fiduciary funds, nor the mere names of the payees on checks drawn on that account, [were] sufficient to create bad faith liability based on the bank's action in paying such checks" even though such

checks were written to "Weil Furs," "Golbro Jewelers," and "Cobb–Kirkland, an automobile dealership").

Nations Title further argues that there was a genuine issue as to whether FSB acted in bad faith because FSB knew that although Secured Equity's business was growing rapidly, the escrow account had a declining average daily balance. As an example, Nations Title points out that in April 1994, the escrow account's balance never fell below $1,500,000. In April 1995, the escrow account's balance was below $828,000. In April 1996, the escrow account had a negative balance.

Richard Shives testified at his deposition that, although he had not known that the daily balances of the escrow account were declining, he had known that the daily balances were fluctuating all of the time. He also stated that he had known that Secured Equity's growth had led it to open branch offices in other cities, such as Columbus and Indianapolis, and that Bertram had told him that at least one of the branch offices was not regularly sending the checks which it received from lenders to be deposited into the escrow account.

We will not conclude that the declining daily balances in an escrow account created a genuine issue as to whether FSB acted in bad faith. As we stated, *supra*, the UFA was created to facilitate banking transactions. Placing a burden on banks to monitor the daily account balances of their numerous fiduciary accounts would not promote this purpose.

Nations Title further argues that there was a genuine issue as to whether FSB acted in bad faith because "[t]he very concept of overdraft protection on an escrow account should have alerted [FSB] to problems" because an escrow account is "merely a 'wash account.' "

Richard Shives testified that when he asked Bertram why he desired overdraft protection, Bertram informed him that some of the funds that Secured Equity was receiving from lenders were not being deposited immediately, and that the loans were being closed with the borrowers before the funds to cover such loans were getting deposited into the escrow account. David Shives testified that FSB had two other customers, including a realtor and an auctioneer, who had overdraft protection for their escrow accounts.

We do not think that Bertram's request for overdraft protection on the escrow account created a genuine issue as to whether FSB acted in bad faith. The excuse that Bertram gave when Richard Shives asked him why he wanted overdraft protection was plausible and must have been true, at least in part, because on two occasions when Secured Equity was informed that the overdraft protection had been utilized, Secured Equity employees brought checks to deposit into the escrow account on the same day. Further, it is understandable that a fiduciary might desire overdraft protection to assure that his own checks are

never denied for insufficient funds. Also, we note that FSB did not charge for overdraft protection unless it was actually utilized.

Nations Title further argues that there was a genuine issue as to whether FSB acted in bad faith because, with minimal investigation, FSB would have discovered that Bertram's stated reason for needing the overdraft protection was false.

As we stated, *supra*, the wheels of commerce would be brought to a halt if a bank were required to inquire about a fiduciary's actions every time there was suspicious circumstances with an escrow account. Such a requirement would thwart the purpose of the UFA. Further, the record reveals that Richard Shives did question Bertram about his need for overdraft protection, so FSB did not grant such protection without any inquiry.

Nations Title further argues that there was a genuine issue as to whether FSB acted in bad faith because FSB violated its own loan policies when it allowed the escrow account to have overdraft protection. Nations Title claims that FSB violated its loan policies as follows: Richard Shives granted Bertram's request for overdraft protection, which violated FSB's policy that loan officers were not to make loans to close personal friends; minutes of committee meetings where loans were presented to the committee were not kept; FSB failed to obtain signed financial statements, copies of tax returns, and a certificate of insurance from Bertram before granting his request for overdraft protection; and FSB failed to review the status of the overdraft protection as required by FSB policies.

During his deposition, Richard Shives testified that, as a loan officer in a small bank, he had made loans to individuals who were his friends "numerous times[.]" David Shives testified during his deposition that no minutes or records were kept of committee meetings. Richard Shives stated that FSB had had current financial statements for Bertram and Secured Equity at the time that he had granted Bertram's requests for overdraft protection and that he had reviewed such financial statements before granting Bertram's requests. He admitted, however, that the financial statements had not been signed, as required by FSB policies. Richard Shives admitted that he had never seen any copies of tax returns for either Bertram or Secured Equity and that FSB had not obtained copies of any certificates of insurance. Richard Shives also testified that the escrow account's overdraft protection had never been reviewed by an FSB committee because the overdraft protection had always been repaid to FSB within a few days after it had been utilized. He further stated that, at the time he granted Bertram's request for the overdraft protection, FSB had had copies of Secured Equity's balance sheet and profit and loss sheet.

While FSB's failure to follow its loan policies could have constituted negligence, mere negligence is insufficient to amount to bad faith. *Trenton Trust Co.*, 599 S.W.2d at 492. Shives did review the unsigned financial statements that he had

before granting Bertram's request for overdraft protection. Further, he asked Bertram why he desired the overdraft protection. If Richard Shives had been intentionally closing his eyes or stopping his ears, he would not have taken these actions. Thus, we do not believe that FSB's violation of its loan policies created a genuine issue of whether FSB acted in bad faith.

Nations Title also argues that there was a genuine issue regarding whether FSB acted in bad faith because FSB had a monetary interest in the continuance of Bertram's actions.

In *Trenton Trust Co.*, the court stated:

"The fact that one dealing with a fiduciary benefits financially from the transaction is a factor to be considered in determining whether he acted in bad faith under the [UFA]. Where a bank engages in transactions with a fiduciary and has 'both reason to suspect a *misappropriation* by a fiduciary and a monetary interest in the continuance *of such activity,*' the bank acts in bad faith. * * * [I]f the [bank] had 'benefited [*sic* ] from the proceeds' of the fiduciary's misappropriation or 'received any of the fruits' thereof, the [bank] could have been held liable to the principal even absent actual knowledge of a breach of fiduciary obligation." (Emphasis added.) *Trenton Trust Co.*, 599 S.W.2d at 493.

The *Trenton Trust Co.* case talks about the bank having a monetary interest in the continuance of the misappropriation. There is no evidence in the record that FSB had a monetary interest in Bertram's defalcations.

While the circumstances surrounding the escrow account might have been suspicious and FSB's actions could have constituted negligence, they were not so cogent or obvious that FSB's failure to investigate Bertram's actions was a deliberate evasion of knowledge because FSB feared that it would learn of his wrongdoing. We must remember that "the [UFA] was not designed so the loss resulting from the acts of a faithless fiduciary shall fall on 'one who was a mere conduit to transmit the fund[s].' " *In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.*, 69 Haw. at 529, 751 P.2d at 81.

The first assignment of error is overruled.

"II. The trial court erred in granting summary judgment in favor of the bank on the issue whether there was indebtedness owed to the bank[.]"

■ Nation's Title argues, pursuant to the third alternative in *Inkrott,* that there was a genuine issue regarding whether the fiduciary was indebted to the bank and the funds were applied to that indebtedness.

R.C. 1339.08 states, in part:

"If such a check is payable to the drawee bank and is delivered to it in payment of or as security for a *personal debt* of the fiduciary to it, the bank is liable to the

principal if the fiduciary in fact commits a breach of his obligation as fiduciary in drawing or delivering the check." (Emphasis added.)

In granting FSB's motion for summary judgment, the trial court concluded that Secured Equity's use of overdraft protection did "not qualify as indebtedness to the bank." The court's conclusion was based upon its findings that the overdraft protection had been used to serve Secured Equity's clients because loan closing transactions had been taking place, with checks being written by Secured Equity, before funds from the lenders covering those checks had been deposited into Secured Equity's checking account and that the five times that the overdraft protection had been drawn upon, the amounts borrowed had been promptly repaid.

Nations Title relies on *Schofield v. Cleveland Trust Co.* (1948), 149 Ohio St. 133, 36 O.O. 477, 78 N.E.2d 167. In that case, two trustees borrowed money from a bank for real estate and commercial loans for their personal advantage. *Schofield,* 149 Ohio St. at 135, 36 O.O. at 477–478, 78 N.E.2d at 169. The loans were repaid with checks drawn on the funds of the trust. *Id.* Further, one of the trustees maintained a personal account at the bank and trust funds were deposited into that account to correct overdrafts that had occurred in it. *Id.* The court held the bank liable for the trustees' misusage of the trust funds, stating:

"Here, [the trustees] took trust funds, known by the bank to be such, and used such funds to pay their *individual indebtedness* to the bank with the co-operation of the bank * * *.

"* * *

" 'Generally, a bank which receives in payment of a fiduciary's *personal indebtedness* to it, or applies to an overdraft in his *individual account,* known trust funds transferred from the fiduciary's trust account to his *individual account,* is liable to the fiduciary's principal * * * for the money so received or applied by it.' " (Emphasis added.) *Id.* at 142–143, 36 O.O. at 480–481, 78 N.E.2d at 172.

The case before us is distinguishable from *Schofield.* In this case, the application for overdraft protection was established under the name of William H. Bertram, Trust Agent and was signed, "Secured Equity Title and Appraisal Agency Corp. (Escrow) William H. Bertram." The overdraft protection was used for the escrow account, not Bertram's personal account. Bertram did not use the funds from the overdraft protection for his own illegal conduct; his defalcations had occurred before the overdraft protection was ever utilized. The funds from the overdraft protection were used to prevent checks that Secured Equity had written from the escrow account from being returned for insufficient funds. The beneficiaries of the overdraft protection, therefore, were Secured Equity, Nations

Title, and the loan borrowers because the overdraft protection funds allowed the real estate transactions, which might otherwise have been delayed for insufficient funds, to go forward. Thus, the indebtedness from the overdraft protection belonged to Secured Equity, not Bertram personally.

FSB also relies on *Mayo v. Pioneer Bank & Trust Co.* (C.A.5, 1959), 270 F.2d 823, certiorari denied (1960), 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877. In that case, a construction contractor obtained a loan from a bank by telling the bank that he wanted to stop doing business individually and begin doing business under a corporate format to insure continuity of his business and to avoid personal liability. *Mayo*, 270 F.2d at 827. After the loan funds were deposited in the corporation's checking account, the contractor had the bank prepare a certified audit showing the amount of funds in the checking account. *Id.* at 828. The contractor used the audit report to obtain a contractor's performance bond from an indemnity company. *Id.* The contractor then repaid the loan, with interest, to the bank. *Id.* The corporation eventually defaulted on a construction contract, and the indemnity company was required to pay money to complete the contract. *Id.* The corporation's trustees in bankruptcy sued the bank, arguing that the corporation's repayment of the loan was a voidable transfer pursuant to the UFA. *Id.* at 829.

The *Mayo* court held that the trustees' argument was not persuasive, stating:

"Under [a section of the Louisiana code which was analogous to R.C. 1339.09], a drawee-bank becomes liable to the principal when a fiduciary draws a check on the principal's account to pay a personal debt if in fact the fiduciary commits a breach of trust.

"The important factor under the [UFA] in holding a bank responsible for a fiduciary's breach of trust is whether or not the debt that was paid was for the *personal use* of the fiduciary. Thus, relief under the [UFA] was allowed in [*LaVecchia v. North Carolina Joint Stock Land Bank* (1940), 218 N.C. 35, 9 S.E.2d 489] where the debtor drew a check as president of the company to buy land for his personal use [and] [n]o part of the loan or its use inured to the company. * * *

"The loan to [the construction contractor], however, was not a loan to a corporate officer for his personal benefit such as the [UFA] contemplates. To the knowledge of the bank, the loan was for the benefit of [the construction corporation] and deposited to [the construction corporation's] account. The conditions necessary for relief under the [UFA] are not present here: the debt incurred was not the kind of personal debt contemplated by the [UFA] * * *." (Emphasis *sic.*) *Id.* at 831–832.

Similarly, in this case, to FSB's knowledge, the overdraft protection was for the benefit of Secured Equity's escrow account and was deposited into that account.

The overdraft protection funds were not utilized for the defalcations or Bertram's personal use. The overdraft protection funds were used to cover checks written for Secured Equity's business. Thus, we conclude that there was no genuine issue regarding whether Bertram was indebted to the bank, as required by R.C. 1339.08.

Nations Title also argues that there was a genuine issue regarding whether FSB had actual knowledge of the defalcations at the time that it repaid itself for the amount of the overdraft protection the last time that such protection was used.

On May 24, 1996, FSB gave the escrow account $161,600 in overdraft protection. On the afternoon of that same day, Bertram called Richard Shives and informed him that he had made some investments with the money from the escrow account. On May 28, 1996, Richard and David Shives went to Bertram's house and were informed of the "magnitude" of the money that was involved and how much could be lost when the stocks were sold, although the exact amount of the investments' market value was still unknown. On the same day, money from Secured Equity's lenders was deposited into the escrow account and FSB automatically withdrew money to repay the outstanding overdraft protection that had been given to the escrow account, plus interest. FSB then terminated the overdraft protection for the escrow account.

R.C. 1339.08 provides, in part,

"If a deposit is made in a bank to the credit of a fiduciary as such, the bank may pay the amount of the deposit or any part thereof upon the check of the fiduciary, signed with the name in which such deposit is entered, without being liable to the principal, unless the bank pays the check with actual knowledge that the *fiduciary is committing a breach of his obligation as fiduciary in drawing the check."* (Emphasis added.)

In this case, Bertram arranged with FSB to have any funds deposited after the overdraft protection was utilized automatically withdrawn from the escrow account to repay the overdraft protection as soon as possible, likely because FSB charged 18% interest on any overdraft protection funds that were utilized. Although no check was written by Secured Equity to repay the overdraft protection, money from Secured Equity's principals was deposited into the escrow account and was withdrawn and paid to the bank. Thus, we find R.C. 1339.08 to be applicable to this argument.

On May 28, 1996, when FSB withdrew the money from the escrow account to cover the overdraft protection that had been granted, FSB had actual knowledge that Bertram had breached his fiduciary obligation by withdrawing funds between February 1995 and March 1996 from the escrow account to invest in

securities. FSB did not have actual knowledge that, in withdrawing the funds from the escrow account to cover the overdraft, which we find to be analogous to the language, "drawing the check[,]" in R.C. 1339.08, Bertram was committing a breach of his fiduciary obligations. FSB knew that the overdraft protection had been used to cover checks drawn from the escrow account for real estate transactions, and that the funds which had been deposited and which were being withdrawn to cover the amount of the overdraft protection had been sent by Nations Title to be applied to such real estate transactions. FSB believed that the overdraft protection had been provided to the escrow account to prevent checks written to loan borrowers from being returned for insufficient funds and that, in repaying itself, FSB was taking money from the escrow account that Nations Title had provided to Secured Equity to fund such borrower's loans. Thus, Nations Title's argument is not persuasive.

The second assignment of error is overruled.

"III. The court below erred by granting summary judgment in favor of Farmers State Bank[.]"

Under this assignment of error, Nation's Title discusses the standard for summary judgment motions. We discussed such standard, *supra*. As no new arguments are set forth, this assignment of error is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

BROGAN and FAIN, JJ., concur.