{¶ 1} Plaintiff-appellant, Western Ohio Colt Racing Association (hereinafter "WOCRA"), appeals the Mercer County Court of Common Pleas judgment granting motions for summary judgment in favor of defendants-appellants, Community First Bank Trust (n.k.a. First Financial Bank) (hereinafter "First Financial") and The Peoples Bank. For the reasons that follow, we affirm.
 {¶ 2} This matter stems from one of WOCRA's employees, Arnold Fast, and his improper use of WOCRA's money. WOCRA is a non-profit organization that sponsors, organizes, and finances harness racing at county fairs in the western Ohio area. From 1992 through 2004, defendant Arnold Fast (hereinafter "Fast") was the secretary and treasurer for WOCRA. As secretary and treasurer of WOCRA, Fast was given the authority to use WOCRA funds to purchase certificates of deposits at various banks, cashier's checks for payment of purse money to county fairs, and to make payments for WOCRA's expenses, including advertising, postage, and printing. Along with working for WOCRA, Fast owned his own business called Fast Blankets and Trophies, which sold trophy blankets for horse racing events.
 {¶ 3} WOCRA maintained a checking account with defendant Peoples Bank, while Fast had a checking account with defendant First Financial. Initially, *Page 3 
with regard to Peoples Bank, WOCRA had required two signatures on every check written for over $1,000, but Fast later changed this requirement to only requiring one signature on WOCRA checks. With respect to First Financial, between 1999 and 2001, Fast presented eleven WOCRA checks to First Financial (the "1999-2001 checks"), which included both Peoples Bank cashier's checks and WOCRA checks. In addition, around 2003, Fast obtained a loan for his personal business through First Financial to purchase trophy blankets he intended to sell to customers in Australia and New Zealand. This loan was secured by Fast's 16-acre farm located in Mercer County. Fast shipped these blankets, valued at over $100,000, but the customers failed to pay for them. In February 2004, Fast's personal loan became due. Then, on February 28, 2004, Fast presented two checks (the "2004 checks") drawn on WOCRA's checking account to First Financial. One check was dated February 27, 2004, in the amount of $80,000 made payable to First Financial; and the other check was dated February 28, 2004, in the amount of $51,000 made payable to First Financial. Fast presented these two checks to a First Financial teller for payment of his personal loan with First Financial. As a result, First Financial cancelled the promissory note and mortgage that Fast had given as collateral for his personal loan.
 {¶ 4} After discovering that Fast had written these two checks on the WOCRA account to pay off his personal loan, WOCRA turned the matter over to *Page 4 
law enforcement. Fast was originally charged with one count of theft, a felony of the third degree, but as part of a plea agreement, Fast pled guilty to theft, a felony of the fifth degree. In addition, Fast was ordered to make restitution in the amount of $185,225. At the sentencing hearing, the trial court determined that Fast had made full restitution as to the criminal case.
 {¶ 5} However, on January 11, 2006, WOCRA filed suit against Fast asserting a cause of action for conversion, and later, on September 21, 2006, WOCRA filed an amended complaint adding First Financial and Peoples Bank as defendants. After a third amended complaint was filed, WOCRA causes of action against First Financial included: (1) failure and/or want of consideration for a negotiable instrument, (2) money had and received, (3) violation of the Uniform Fiduciary Act, (4) breach of common law duty, (5) acting in bad faith and a commercially unjustifiable manner, and (6) conversion. In addition, WOCRA alleged breach of contract and negligence causes of action against Peoples Bank. All of the parties filed motions for summary judgment. On July 10, 2008, the trial court denied WOCRA's motion for summary judgment and Fast's motion for summary judgment; however, it granted Peoples Bank and First Financials' motions for summary judgment.
 {¶ 6} WOCRA now appeals and raises eight assignments of error. *Page 5 
 ASSIGNMENT OF ERROR NO. I THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN THAT GENUINE ISSUES OF MATERIAL FACT EXIST WHICH PRECLUDE [SIC] SUMMARY JUDGMENT.
 ASSIGNMENT OF ERROR NO. II THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR COMMON LAW FAILURE AND/OR WANT OF CONSIDERATION FOR THE INSTRUMENTS PAYABLE TO FIRST FINANCIAL.
 ASSIGNMENT OF ERROR NO. III THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR CONVERSION AGAINST FIRST FINANCIAL.
 ASSIGNMENT OF ERROR NO. IV THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR COMMON LAW BREACH OF DUTY AGAINST FIRST FINANCIAL.
 ASSIGNMENT OF ERROR NO. V THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM AGAINST FIRST FINANCIAL FOR ACTING IN BAD FAITH AND IN A COMMERCIALLY UNJUSTIFIABLE MANNER.
 ASSIGNMENT OF ERROR NO. VI THE TRIAL COURT ERRED TO THE PREJUDICED [SIC] OF APPELLANT BY DISMISSING THE CLAIM FOR MONEY HAD AND RECEIVED AGAINST FIRST FINANCIAL. *Page 6 
 ASSIGNMENT OF ERROR NO. VII THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM AGAINST FIRST FINANCIAL PURSUANT TO THE UNIFORM FIDUCIARY ACT AS CODIFIED IN ORC CHAPTER 1339.
 ASSIGNMENT OF ERROR NO. VIII THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIMS AGAINST THE PEOPLES BANK RELATING TO NEGLIGENCE AND BREACH OF CONTRACT IN THE ESTABLISHMENT AND MAINTENANCE OF THE APPELLANT'S CHECKING ACCOUNT.
 {¶ 7} We review a decision to grant summary judgment de novo. Doe v.Shaffer (2000), 90 Ohio St.3d 388, 390, 738 N.E.2d 1243. Under this standard of review, we review the appeal independently, without any deference to the trial court. Conley-Slowinski v. Superior Spinning Stamping Co. (1998), 128 Ohio App.3d 360, 363, 714 N.E.2d 991. A motion for summary judgment will be granted only when the requirements of Civ. R. 56(C) are met. Thus, the moving party must show: (1) that there is no genuine issue of material fact, (2) that the moving party is entitled to judgment as a matter of law, and (3) that reasonable minds can reach but one conclusion when viewing the evidence in favor of the non-moving party, and the conclusion is adverse to the non-moving party. Civ. R. 56(C); State ex rel. Cassels v. Dayton City School Dist. Bd. ofEdn. (1994), 69 Ohio St.3d 217, 219, 631 N.E.2d 150. *Page 7 
 {¶ 8} The party asking for summary judgment bears the initial burden of identifying the basis for its motion in order to allow the opposing party a "meaningful opportunity to respond." Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 116, 526 N.E.2d 798. The moving party must also demonstrate the absence of a genuine issue of material fact as to an essential element of the case. Dresher v. Burt (1996),75 Ohio St.3d 280, 292, 662 N.E.2d 264. Then the moving party must demonstrate that they are entitled to summary judgment as a matter of law, at which time, the burden then shifts to the non-moving party to produce evidence on any issue which that party bears the burden of production at trial.Deutsche Bank Trust Co. v. McCafferty, 3d Dist. No. 1-07-26,2008-Ohio-520, ¶ 9, citing Civ. R. 56(E).
 {¶ 9} Because of the general nature of WOCRA's first assignment of error, we elect to address it last.
 ASSIGNMENT OF ERROR NO. II THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR COMMON LAW FAILURE AND/OR WANT OF CONSIDERATION FOR THE INSTRUMENTS PAYABLE TO FIRST FINANCIAL.
 {¶ 10} In its second assignment of error, WOCRA argues that the trial court erred in its determination that First Financial had given consideration for the 2004 checks Fast presented in payment of his personal loan. WOCRA argues that the cancellation of the note and release of the security interest against Fast was not *Page 8 
proper consideration because it was given to Fast and not to WOCRA, thus there was a failure and/or want of consideration for the 2004 checks.
 {¶ 11} In response, First Financial argues that the trial court did not err in granting its summary judgment motion with respect to the failure and/or lack of consideration claim for two reasons. First, First Financial claims that failure and/or want of consideration is not an affirmative claim of relief, rather it is an affirmative defense that can be raised with respect to negotiable instruments. Second, even if it can be a cause of action, both Fast and First Financial gave consideration for the 2004 checks — Fast agreed to provide payment to First Financial totaling $131,000, and First Financial agreed to cancel his promissory note and mortgage.
 {¶ 12} In its judgment entry, the trial court found that failure and/or want of consideration was not an affirmative claim of relief, but that even still, First Financial had given consideration when it cancelled its security interest in Fast's property. (July 10, 2008 JE at 13).
 {¶ 13} In this case, there is no reason to discuss the details of when a party gives consideration with respect to negotiable instruments, because it is clear that failure and/or want of consideration are not affirmative claims for relief. The Ohio Supreme Court in Ohio Loan Discount Co. v. Tyarks recognized that failure and/or want of consideration are well established affirmative defenses that can be *Page 9 
raised by a defendant in claims arising from negotiable instruments. (1962), 173 Ohio St. 564, 568, 184 N.E.2d 374. Thus, while WOCRA disputes the fact that First Financial gave consideration for the 2004 checks in the form of releasing its note and mortgage, its argument is meritless. First Financial was, as a matter of law, entitled to summary judgment as to the failure and/or want of consideration claim because it is not a cognizable claim for relief.
 {¶ 14} WOCRA's second assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. III THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR CONVERSION AGAINST FIRST FINANCIAL.
 {¶ 15} In its third assignment of error, WOCRA argues that the trial court erred in determining that WOCRA had no claim for conversion. First, WOCRA claims that the conversion occurred after First Financial took custody and control of the money; specifically, WOCRA claims that First Financial converted the funds when it applied the money to Fast's personal loan. In addition, WOCRA claims that since the checks were properly payable to First Financial, R.C. 1303.16(G)(1) is inapplicable.
 {¶ 16} In order to address WOCRA's assignment of error, it is necessary to describe and define this situation in terms of commercial paper. Checks are considered "drafts" that are essentially orders given by a drawer to a drawee to *Page 10 
make payment to an identified person (payee). R.C. 1303.01(A)(2)(3) (8), R.C. 1303.03(E)(2). Cashier's checks are also drafts and are the same as checks, except that the drawer and the drawee are the same bank, and they are purchased by a person called the remitter. R.C. 1303.01(A)(13); R.C. 1303.03(G). A "drawer" is "a person who signs or is identified in a draft to make payment," while a "drawee" is "a person ordered in a draft to make payment." R.C. 1303.01(A)(2), (3). Here, with respect to the checks that were drawn on WOCRA's account with Peoples Bank, WOCRA was the drawer and Peoples Bank was the drawee. With respect to the cashier's checks, WOCRA was the remitter, the person who purchased the cashier's check from Peoples Bank, who was both the drawer and drawee.
 {¶ 17} In general, conversion occurs when there is the "wrongful exercise of dominion over property to the exclusion of the rights of the owner, or withholding it from his possession under a claim inconsistent with his rights." State ex rel. Toma v. Corrigan (2001),92 Ohio St.3d 589, 592, 752 N.E.2d 281. In addition, a cause of action for conversion of a negotiable instrument is prescribed in R.C. 1303.60(A), and states:
 [t]he law applicable to conversion of personal property applies to instruments. An instrument also is converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or if a bank makes or obtains payment with respect to the instrument for a person not entitled to enforce the instrument or receive payment. *Page 11 
Under the plain language of the statute and the general law regarding conversion, conversion of a negotiable instrument occurs when a person who has wrongful possession of an instrument, transfers possession to another person, who likewise is in wrongful possession of the instrument. However, under the circumstances in this case, Fast was given authority to write checks on WOCRA's account and to purchase cashier's checks with WOCRA funds because he was WOCRA's secretary/treasurer. Thus, we do not see how First Financial could have ever been in wrongful possession of the checks when Fast had the authority to write them. Moreover, First Financial did not convert WOCRA's money when it applied it to Fast's personal loan, rather than holding it in trust for WOCRA, because it did not do anything contrary to what it had been instructed to do. Because Fast was an agent of WOCRA and had been given authority to handle WOCRA's money, Fast's instructions were WOCRA's instructions. Fast told First Financial to apply the money to his personal loan, and First Financial complied. Therefore, there was no conversion.
 {¶ 18} Nevertheless, WOCRA still could not have maintained an action for conversion as a matter of law. First of all, as stated above, with respect to the checks written by Fast and drawn on WOCRA's checking account at Peoples Bank, WOCRA was the drawer and Peoples Bank was the drawee. However, according the statute and case law, a drawer may not bring an action for *Page 12 
conversion. Pursuant to R.C. 1303.60(A), "[a]n action for conversion of an instrument may not be brought by the issuer," and "issuer" is defined as a maker or drawer of an issued or unissued instrument. R.C. 1303.01(A)(6). See also, Jones v. Bea, 1st Dist. No. C-030261,2004-Ohio-1115, ¶ 9, citing White Summers, Uniform Commercial Code (1988) 662, Section 15-5; ATS Ohio, Inc. v. Shively (Sept. 2, 1999), 5th Dist. No. 99 CA 5, at *4. Therefore, with respect to any of the checks drawn on WOCRA's account, including the two 2004 checks written by Fast made payable to First Financial to pay off his personal loan, WOCRA, as a matter of law, cannot maintain an action for conversion.
 {¶ 19} The only checks that WOCRA could have maintained an action for conversion were for the five Peoples Bank cashier's checks issued from 1999-2001; however, any action on those checks is now barred by the statute of limitations. R.C. 1303.16(G)(1), which codified the law prescribed in Uniform Commercial Code ("U.C.C.") § 3-118, specifically states that an action for conversion of an instrument shall be brought within three years after the cause of action accrues. Generally, a cause of action accrues when the wrongful act is committed. Harris v.Liston (1999), 86 Ohio St.3d 203, 205, 714 N.E.2d 377. Here, the wrongful act being alleged by WOCRA is the issuance of the cashier's checks to First Financial in order to pay off Fast's personal loan. The cashier's checks were issued in 1999 and 2001 to First Financial, thus the cause of action *Page 13 
for conversion would have accrued at those respective times. Applying the three year statute of limitations, any conversion claims were time barred on the 1999 cashier's checks in 2002, and on the 2001 checks in 2004. Therefore, since WOCRA did not file its complaint until January 11, 2006, WOCRA was precluded as a matter of law from asserting any conversion cause of action on the cashier's checks.
 {¶ 20} WOCRA argues that the statute of limitations is inapplicable because all of the checks were properly payable to First Financial. However, because WOCRA initiated the conversion claim under R.C. 1303.60, by law, the conversion claim under R.C. 1303.60 triggered the statute of limitations under R.C. 1303.16(G)(1). Thereby, WOCRA's argument is meritless.
 {¶ 21} Finally, WOCRA argues that First Financial is liable for conversion because it is not a holder in due course. WOCRA argues that First Financial cannot be a holder in due course because it did not give value for the instruments and had notice of Fast's breach of fiduciary duty under R.C. 1303.37(B)(4)(a).
 {¶ 22} R.C. Chapter 1303 confers certain rights and protections to persons who qualify as holders in due course, such as taking instruments free from all claims and defenses, except in certain limited situations.All American Finance Co. v. Pugh Shows, Inc. (1987), 30 Ohio St.3d 130,131, 507 N.E.2d 1134 (citation omitted). We will later discuss in greater detail the implications of Fast's breach *Page 14 
of fiduciary duty under R.C. 1303.37(B)(4)(a), but as to this assignment of error any discussion of whether First Financial is a holder in due course is immaterial. As a matter of law, WOCRA cannot bring a claim for conversion as to any of its checks. As previously stated, all of the cashier's checks from 1999-2001 are barred by the statute of limitations, and WOCRA cannot maintain an action for conversion on the other checks drawn on WOCRA's account because it was the issuer of those checks. Therefore, whether or not First Financial has the protection of a holder in due course is not dispositive.
 {¶ 23} WOCRA's third assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. IV THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM FOR COMMON LAW BREACH OF DUTY AGAINST FIRST FINANCIAL.
 {¶ 24} In its fourth assignment of error, WOCRA argues that the trial court erred by dismissing its claim for common law breach of duty[1]
against First Financial. WOCRA claims that the common law duty that First Financial owed to WOCRA was stated in Master Chemical Corp. v.Inkrott (1990), 55 Ohio St.3d 23, 563 N.E.2d 26, as follows: *Page 15 
 In applying the common law, courts across the country have found uniformly that when a check is drawn to the order of a bank, the drawer has indicated his intention to place the funds in the bank's custody. Annotation, Liability of Bank for Diversion to Benefit of Presenter or Third Party of Proceeds of Check Drawn to Bank's Order not Indebted to Bank (1989), 69 A.L.R. 4th 778, 801. The bank is not entitled to treat the checks as bearer paper. (See UCC 3-110 and 3-111.) Once the payee bank accepts custody and control of the funds, it can justify dispensing the funds only in compliance with the instructions of the drawer. Annotation, supra, at 802. If the payee bank assumes, without investigation, that the instructions of the presenter are those of the drawer, the payee bank does so at the risk of discovering that no such directions were given by the drawer. The payee bank becomes liable for the misdirected funds.
Id. at 25 (footnote omitted). Based on the above language, WOCRA claims that because all of the WOCRA checks were drawn to the order of First Financial, the drawer (WOCRA) had indicated its intention to place the funds in the custody of First Financial. As a result, First Financial could not treat the checks as bearer paper and could have only dispensed the funds in accordance with WOCRA's instructions. In addition, WOCRA argues that because First Financial was the payee, it assumed the risk that the instructions Fast gave were not in compliance with the instructions of WOCRA, the drawer.
 {¶ 25} In its judgment entry, the trial court specifically consideredInkrott, but found that it was factually distinguishable from the present case, and therefore, not controlling. (July 10, 2008 JE at 11-12). We agree with the trial court's conclusion that Inkrott is inapplicable to this particular issue. *Page 16 
 {¶ 26} In Inkrott, Master Chemical's controller took checks made payable to defendant-bank (Toledo Trust), altered the amounts, and deposited them into an account he had established under an assumed name. Id. at 23-24. Essentially, Toledo Trust had permitted the employee, who it knew to be a fiduciary of Master Chemical, to deposit the funds in a different account that was under the employee's control, rather than placing the checks within Toledo Trust's custody. Master Chemical sued Toledo Trust alleging wrongful payment of a check deposited. Id. at 23. The Ohio Supreme Court agreed with the Court of Appeals that the checks were not properly payable because Toledo Trust had not paid the named payee, citing the rule that checks that are made payable to banks are not bearer paper and a bank treating it as such does so at its own peril. Id. at 25.
 {¶ 27} As stated above, we agree with the trial court's conclusion that Inkrott is inapplicable to this particular issue. First of all, inInkrott, the plaintiff-employer sued the bank for depositing not properly payable checks, while here, not only is WOCRA claiming the checks were properly payable, but it's alleging a cause of action for conversion. See id. at 24. Second, in Inkrott, Toledo Trust was the drawee bank for the plaintiff-employer and the payee of the drafts — it was ordered in the drafts to make payment to itself. Id. at 23. Here, First Financial was only the payee and not WOCRA's drawee bank, but rather Peoples Bank was the drawee bank (the institution ordered to make payment). In addition, the Ohio *Page 17 
Supreme Court in Inkrott focused on the fact that Toledo Trust had actual knowledge of the employee's fiduciary status since it was the drawee bank for both the plaintiff-employer and its employee. Id. at 23. On the other hand, in this case, First Financial was not the drawee bank for both the employer (WOCRA) and the employee (Fast), rather it was only the drawee bank for the employee. Thus, as discussed in further detail below, First Financial did not possess actual knowledge of Fast's fiduciary status like Toledo Trust in Inkrott, who by virtue of its direct working relationship with both parties had actual knowledge.
 {¶ 28} Furthermore, one of Toledo Trust's most significant wrongful actions in Inkrott was taking checks that were directly payable to it by the plaintiff-employer, treating the checks like bearer paper, [2] and allowing them to be deposited in another account, which was controlled by a person known to be the employer's fiduciary. See id. at 25. Toledo Trust's conduct was wrongful because it had allowed an instrument made payable to itself to be deposited in another's account, which was contrary to the instructions on the instruments. See id. Here, the checks were all made payable to First Financial, who rightfully took the checks into its custody, and applied the proceeds consistent with the instructions on the checks. *Page 18 
 {¶ 29} Overall, there are many factual distinctions betweenInkrott and the case sub judice which leads us to conclude that WOCRA cannot rely on Inkrott's holding to illustrate the existence of a common law duty from First Financial to WOCRA in this assignment of error.
 {¶ 30} WOCRA still argues that First Financial should have investigated or inquired into whether the instructions of Fast as presenter were those of the drawer (WOCRA). However, WOCRA has not demonstrated how First Financial owed it a duty to inquire, other than pointing to the Inkrott case, which this Court finds inapplicable to this issue. First Financial took facially valid checks as payment for a valid debt owed to it by a customer. WOCRA was not a customer of First Financial and it was not First Financial's duty to inquire into why WOCRA was paying Fast's personal debt. See Amzee Corp. v. ComericaBank-Midwest, 10th Dist. No. 01AP-465, 2002-Ohio-3084, ¶ 50.
 {¶ 31} Therefore, since the application of Inkrott is WOCRA's only argument for why the trial court erred in dismissing its common law breach of duty claim against First Financial, and we have concluded thatInkrott is inapplicable to that issue, we find that First Financial was entitled to summary judgment.
 {¶ 32} WOCRA's fourth assignment of error is, therefore, overruled. *Page 19 
 ASSIGNMENT OF ERROR NO. V THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM AGAINST FIRST FINANCIAL FOR ACTING IN BAD FAITH AND IN A COMMERCIALLY UNJUSTIFIABLE MANNER.
 ASSIGNMENT OF ERROR NO. VII THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIM AGAINST FIRST FINANCIAL PURSUANT TO THE UNIFORM FIDUCIARY ACT AS CODIFIED IN ORC CHAPTER 1339.
 {¶ 33} Because WOCRA's fifth and seventh assignments of error involve the application of the Uniform Fiduciary Act ("UFA"), we will address them together.
 {¶ 34} Essentially, in its fifth and seventh assignments of error, WOCRA argues that the trial court erred in not finding First Financial acted in bad faith. In addition, WOCRA claims the trial court also erred in determining that the UFA only applied to drawee banks and that since First Financial was not the drawee bank, the UFA was inapplicable.
 {¶ 35} On appeal, WOCRA points to R.C. 1339.08, 1339.09, and 1339.10
as grounds for finding First Financial liable. However, in its judgment entry, the trial court only addressed R.C. 1339.08 and 1339.09, and did not address R.C. 1339.10. Nevertheless, in ruling on WOCRA's motion for summary judgment, as to R.C. 1339.08 and 1339.09, the trial court found that these statutes only applied *Page 20 
to drawee banks relying on the language that a bank "may pay" the check without liability, unless it has actual knowledge of a breach or bad faith. (July 10, 2008 JE at 12). Although, in ruling on First Financial's motion for summary judgment, the trial court continued its analysis and stated:
 Even if WOCRA was correct in its assertion that R.C. § 1339.09 applies to drawer banks, the claim still fails because of the requirement for a finding of liability under that section. For a bank to be liable under R.C. § 1339.09, it must act with actual knowledge that the fiduciary is committing a breach of his duty. WOCRA asserts that First Financial is charged with such actual knowledge under R.C. § 1303.37. That section, however, merely states rules whereby notice of the breach of fiduciary duty is imputed to a bank which deals with a fiduciary. Furthermore, R.C. § 1303.37 has its own requirement to demonstrate actual knowledge of fiduciary status before notice will be imputed to a bank. * * * WOCRA also has not submitted sufficient evidence in support of its allegation that First Financial had actual knowledge of Fast's breach of fiduciary duty when it took the checks drawn on WOCRA's account. The only support WOCRA advances in support of this allegation is that the checks were drawn upon WOCRA's account. This is not sufficient to constitute actual knowledge of the existence of a fiduciary relationship under R.C. § 1303.37.
 {¶ 36} Even though WOCRA and First Financial argue whether the trial court was correct in finding that the UFA only applies to drawee banks, we decline to address the appropriate application of the provisions in the UFA as it relates to this case, because all of the provisions WOCRA relies on require the same showings for liability, and we believe there are no genuine issues of material fact with respect to those provisions. *Page 21 
 {¶ 37} In bringing these claims against First Financial, WOCRA relied on Ohio's Uniform Fiduciary Act ("UFA"), which was codified in R.C. Chapter 1339 when WOCRA filed suit against First Financial in 2006.[3]
Essentially, the UFA was designed to "shield[] a bank from liability when the bank knows that the individual is acting for the benefit of another," and "to protect those who honestly deal with another knowing him to be a fiduciary and to place the responsibility of employing honest fiduciaries on the principal." Inkrott, 55 Ohio St.3d at 27, citing Johnson v. Citizens Natl. Bank of Decatur (1975), 30Ill.App.3d 1066, 1070, 334 N.E.2d 295, 298; Boutros v. Riggs Natl.Bank (C.A.D.C. 1981), 655 F.2d 1257, 1259.
 {¶ 38} Overall, on this appeal, WOCRA points to R.C. 1339.08, 1339.09, and 1339.10 as grounds for finding First Financial liable. Each provision governs different situations, but under each provision in order for a bank to be liable, the depositor-drawer of the fiduciary must show that: (1) the bank had actual knowledge that the fiduciary was committing a breach of his obligations as a fiduciary, or (2) had knowledge of such facts that its actions in paying the check amounted to bad faith. R.C. 1339.08, 1339.09, 1339.10. See also, Inkrott,55 Ohio St.3d at 23, syllabus; Nations Title Ins. of New York, Inc. v.Bertram (2000), *Page 22 140 Ohio App.3d 157, 163-64, 746 N.E.2d 1145 (applying the Ohio Supreme Court's interpretation of R.C. 1339.09 to R.C. 1339.08). While a complaining principal may show either one of the two grounds to establish a bank's liability, here WOCRA has only argued that First Financial had knowledge of such facts that its actions in paying the checks amounted to bad faith (#2 above).
 {¶ 39} The UFA does not define the term "bad faith," rather Ohio courts have often looked to whether a transaction is "commercially unjustifiable" in order to determine whether a bank acted in bad faith.Savin v. Central Trust Co., N.A. (1995), 106 Ohio App.3d 465, 470,666 N.E.2d 332, citing Inkrott, 55 Ohio St.3d at 27. Accordingly, to be commercially unjustifiable, "[t]he facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." Savin, 106 Ohio App.3d at 470, quoting Inkrott, 55 Ohio St.3d at 27, citing Transport Trucking Co. v.First Natl. Bank in Albuquerque (1955), 61 N.M. 320, 325, 300 P.2d 476. WOCRA claims that the imputation of notice of a breach of fiduciary duty prescribed in R.C. 1303.37(B)(4)(a), along with the multiple transactions involving First Financial, gave rise to the necessary showing of bad faith under the provisions of the UFA.
 {¶ 40} First, we must start with analyzing R.C. 1303.37 (which codified U.C.C. § 3-307), because WOCRA's arguments for finding First Financial liable *Page 23 
under the UFA rely on finding all of the elements in R.C. 1303.37(B)(4)(a) are met. R.C. 1303.37 governs when a party has notice of a breach of fiduciary duty. WOCRA specifically points to 1303.37(B)(4)(a), which states:
 If an instrument is taken from a fiduciary for payment or collection or for value, the taker has knowledge of the fiduciary status of the fiduciary, and the represented person makes a claim to the instrument or its proceeds on the basis that the transaction of the fiduciary is a breach of fiduciary duty, all of the following rules apply: (4) If an instrument is issued by the represented person or by the fiduciary of the represented person to the taker as payee, the taker has notice of the breach of fiduciary duty if * * * (a) The instrument is taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary.
In order for this section to apply, the complainant must show that the taker had knowledge of the fiduciary's status — notice which does not amount to knowledge is insufficient. U.C.C. § 3-307, 1990 Official Comments. While "notice" of a fact can include actual knowledge of it, receiving notice of it, or implying it from the facts and circumstances known to the person at the time, "knowledge" of a fact only means when a person has actual knowledge of it. R.C. 1301.01(Y).
 {¶ 41} Under this section and the facts of this case, WOCRA alleges that First Financial was repeatedly charged with actual notice of Fast's breach of fiduciary duty pursuant to R.C. 1303.37(B)(4)(a), which constituted bad faith under the UFA. As evidence of the numerous transactions involved, WOCRA points to First Financial's admissions to the question of when Fast's debts were *Page 24 
paid with WOCRA funds. In addition, WOCRA argues that First Financial had knowledge of Fast's fiduciary status to WOCRA because Fast's status was "conspicuously printed on the face of all of the WOCRA checks as his name and the titles of Secretary and Treasurer appear[ed] thereon." (Appellant's Brief at 8).
 {¶ 42} Our review of the record reveals that Fast testified at his deposition to being WOCRA's secretary and treasurer from 1992 until his termination in 2004. (Fast Depo. at 6). Fast testified that as part of his job duties, he was responsible for the record keeping and took care of WOCRA's checking account and banking. (Fast Depo. at 6). In addition, he maintained his own bank account and had been a customer to First Financial for at least sixty years. (Fast Depo. at 87). Fast also had his own business called Fast Blankets and Trophies, Inc., which sold trophy blankets for horse racing events. (Fast Depo. at 113). And sometime in or around 2003, Fast testified he obtained a personal loan with First Financial to purchase blankets for his business, and the loan became due in 2004. (Fast Depo. at 9, 81-83).
 {¶ 43} While there was inconsistent testimony from Fast at his deposition about exactly how many checks he had written to First Financial that were applied to his personal loans, it is clear from the record that at least two of these checks were used to pay off his personal loan. (Fast Depo. at 7, 9, 43, 86). Fast admitted to writing two checks drawn on WOCRA's account, dated February 27 and 28, *Page 25 
2004, made payable to First Financial, and presenting them for the sole purpose of paying off his personal loan with First Financial. (Fast Depo. at 43); (Fast Aff at ¶¶ 1, 3). He further testified that he presented the two checks to a First Financial teller, but he neither told her about his relationship or status with WOCRA nor did she ask him questions regarding his status with WOCRA. (Fast Depo. at 87-88). Although, Fast testified that at the top of the two checks, in WOCRA's logo it clearly stated his name and had the abbreviations for secretary and treasurer. (Fast Depo. at 44).
 {¶ 44} As a result of using WOCRA's money to pay off his personal loan with First Financial, Fast was terminated as secretary and treasurer and was prosecuted. (Fast Depo. at 77-78). Ultimately, he pled guilty to theft, a felony of the fifth degree, and was ordered to pay restitution in the amount of $185,225.00. (Def Exs. A, B).
 {¶ 45} As mentioned above, Fast could not recall exactly how many checks he had written using WOCRA's funds to pay off his personal loans with First Financial. Dennis Fricke, current president of WOCRA, testified that after the association discovered Fast's wrongdoings in early 2004, it ran an internal audit dating back to 2001. (Fricke Depo. at 49, 99). As a result of this audit, WOCRA could not account for a total of $667,297.00 from 2001 through 2004. (Id.). WOCRA knew that $131,000 was illegitimately used by Fast to pay off his *Page 26 
personal loans (the 2004 checks); however, Fricke testified that he nor anyone else at the association knew what happened to the rest of the unaccounted for money. (Id.).
 {¶ 46} WOCRA submitted a request for admissions, production of documents, and interrogatories to First Financial. (Plaintiff's Third Req.) Specifically, WOCRA asked First Financial to admit to all of the WOCRA checks that Fast had presented to pay off his personal loan. (Id.). In response, First Financial submitted the following: $33,985.08 March 1, 2001; $46,672.12 March 14, 2001; $120,000.00 February 28 2002; $41,549.99 April 11, 2003; $80,00.00 March 1, 2004; and $50,000.00 March 1, 2004. (Defendant's Response to Req.)
 {¶ 47} In its motion for summary judgment, First Financial attached the affidavit of Carolyn Pierstorff, who was one of its assistant branch managers. She stated that on or around February 28, 2004, Fast came into her branch and presented two checks totaling $131,000 to a teller in order to pay off a loan he had obtained through First Financial on or around August 25, 2003. (Carolyn Pierstoff Aff at ¶¶ 1-3) The two checks were applied to and paid off the balance of the loan, and as a result, First Financial cancelled the promissory note and mortgage that Fast had given as collateral for the loan. (Id. at ¶¶ 5-6).
 {¶ 48} Furthermore, WOCRA introduced into evidence copies of all the checks allegedly written by Fast, including the two 2004 checks drawn on *Page 27 
WOCRA's account. (Plaintiff's Ex. 6). Both of these checks have WOCRA's logo on the top left-hand corner, which states "WESTERN OHIO COLT RACING ASSOCIATION," and has "Arnold Fast, SEC./TREAS.," below along with WOCRA's address, phone/fax number, and its website address. (Id.). The two checks are made payable to Community First Bank Trust (now First Financial) for $80,000 and $51,000, respectively. (Id.). In addition, the name "Arnold Fast" is on the signature line on the bottom right-hand corner of both of the checks. (Id.).
 {¶ 49} Based on the foregoing and in viewing the evidence presented in a light most favorable to WOCRA as the non-moving party, we find WOCRA has failed to allege a genuine issue of material fact exists as to whether First Financial had actual knowledge of Fast's fiduciary status to WOCRA. As stated above, to have notice of a breach of fiduciary duty imputed onto a party dealing with a fiduciary, two of the things the complainant must show is (1) that the taker had knowledge of the fiduciary status of the fiduciary, and (2) that the instrument was taken in payment of or as security for a debt known by the taker to be the personal debt of the fiduciary. R.C. 1303.37(B)(4)(a). See also, U.C.C. § 3-307, 1990 Official Comments. There is undisputed evidence that at least the 2004 checks were taken in payment of a debt known by First Financial to be the personal debt of Fast, the fiduciary. (Carolyn Pierstoff Aff at ¶ 2) However, the affidavits, *Page 28 
depositions, and other admitted evidence proffered by the parties on summary judgment do not support the conclusion that First Financial had actual knowledge of Fast's fiduciary status to WOCRA. The only thing that WOCRA points to in support its allegation that First Financial had actual knowledge of Fast's fiduciary status is the actual check drawn on its account at Peoples Bank, with its logo at the top right-hand corner. At most, this put First Financial on notice of Fast's fiduciary status, but it does not by itself, demonstrate actual knowledge. In fact, during Fast's deposition, he testified that he had not told the First Financial bank teller about his fiduciary status to WOCRA nor did she ask him any questions regarding the checks.
 {¶ 50} Because there are no genuine issues of material fact as to whether First Financial had actual knowledge of Fast's fiduciary status, WOCRA cannot rely on R.C. 1303.37 to show that First Financial repeatedly had notice of Fast's breach of fiduciary duty and thereby acted in bad faith under the UFA provisions. Thus, as to WOCRA's UFA causes of action, First Financial was entitled to judgment as a matter of law.
 {¶ 51} Therefore, WOCRA's fifth and seventh assignments of error are overruled.
 ASSIGNMENT OF ERROR NO. VI THE TRIAL COURT ERRED TO THE PREJUDICED [SIC] OF APPELLANT BY DISMISSING THE CLAIM FOR *Page 29 MONEY HAD AND RECEIVED AGAINST FIRST FINANCIAL.
 {¶ 52} In its sixth assignment of error, WOCRA argues that the trial court erred when it dismissed its cause of action for money had and received against First Financial.
 {¶ 53} Ohio recognizes a cause of action for money had and received when a party to a contract has fully performed and another party has been unjustly enriched. Hummel v. Hummel (1938), 133 Ohio St. 520, 528,14 N.E.2d 923. This cause of action is one based in equity, not on a contractual but rather a moral obligation to make restitution where keeping the benefits would result in inequity or injustice. Id. at 526. Therefore, a party may be held not liable on the contract, but nevertheless, be liable in equity. Id.
 {¶ 54} For an example, in Hummel, the defendant (who was the son of the plaintiffs) entered into a contract with his parents to pay them the proceeds of an insurance policy. Id. at 522-23. The contract was ultimately unenforceable because of the Statute of Frauds. Id. at 525. However, when the son received the funds and deposited the money into a joint account with his spouse, the court using equity as its grounds, allowed his parents to recover the proceeds in a quasi-contract action for unjust enrichment or money had and received. Id. at 528-29. The son's wife was held jointly liable because she had directly participated with her husband (the son) by withholding the money from his parents. Id. *Page 30 
 {¶ 55} WOCRA argues that the trial court erred in two instances when it dismissed its cause of action for money had and received against First Financial. First, WOCRA claims that the trial court erred when it determined that First Financial did not owe it a duty, but only owed a duty to Fast. In support, WOCRA cites to Inkrott again for the proposition that First Financial owed a duty to hold the funds made payable to First Financial until it received further instructions from WOCRA as the drawer and depositor. However, this Court has already foundInkrott inapplicable to that particular issue; therefore, WOCRA cannot rely on that case to show First Financial owed it a duty. Therefore, we find WOCRA's first argument unpersuasive.
 {¶ 56} Second, WOCRA acknowledges that while there was no contract between itself and First Financial, this Court should imply a contract at law or a constructive trust, because to suggest First Financial did not owe it a duty would be contrary to law. In addition, WOCRA claims that the trial court erred when it determined that First Financial was not unjustly enriched. WOCRA argues that First Financial was unjustly enriched by taking WOCRA's money, applying it to, and thereby releasing, Fast's debt with the bank, which it would not have been able to do had it had not been for WOCRA's money.
 {¶ 57} This Court finds WOCRA's claim that an implied contract at law existed between the parties meritless. Implied contracts in law are different from *Page 31 
contracts implied in fact in that contracts implied in law are not true contracts, but rather are quasi-contracts or constructive contracts imposed by courts to prevent unjust enrichment. Dunn v. Bruzzese,172 Ohio App.3d 320, 2007-Ohio-3500, 874 N.E.2d 1221, ¶ 27; Vargo v.Clark (1998), 4th Dist. No. 97CA37, 128 Ohio App.3d 589, 595,716 N.E.2d 238. Implied in law contracts are a legal fiction used to achieve an equitable result, thus since it is based in equity, it is not necessary to prove the elements of a contract. Id. Instead an "obligation is imposed to prevent a party from retaining money or benefits which in justice and equity belong to another." Legros v. Tarr (1989),44 Ohio St.3d 1, 8, 540 N.E.2d 257.
 {¶ 58} There can be occasions where an innocent party may be liable for restitution to a defrauded party; however, the innocent party is only liable for restitution if they were actually enriched and only if there has not been a change of circumstances making it inequitable to require restitution. ATS Ohio, Inc. v. Shively (Sept. 2, 1999), 5th Dist. No. 99 CA 5, at *6. We believe that First Financial was not unjustly enriched by the WOCRA's checks being applied to Fast's personal loan. Fast had the authority to write checks drawn on WOCRA's bank account, and he had done so a number of times while he was its secretary/treasurer from 1992 to 2004. Moreover, WOCRA had no contractual relationship with First Financial, and while First Financial may have had notice of *Page 32 
Fast's fiduciary status to WOCRA, there is no evidence that either party knew of each other's existence. In addition, Fast also legitimately owed First Financial money from a loan he had taken. In exchange for the balance due on the loan, First Financial changed its position when it released Fast's security interest and cancelled his promissory note. Thus, the circumstances are such that to require First Financial to pay WOCRA back for checks it had given its fiduciary the power to write would be inequitable to First Financial. This is especially true since WOCRA was the one who was overseeing its fiduciary and First Financial had no reason to suspect the checks it was given were presented in breach of a fiduciary duty.
 {¶ 59} Therefore, WOCRA's sixth assignment of error is overruled.
 ASSIGNMENT OF ERROR NO. VIII THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DISMISSING THE CLAIMS AGAINST THE PEOPLES BANK RELATING TO NEGLIGENCE AND BREACH OF CONTRACT IN THE ESTABLISHMENT AND MAINTENANCE OF THE APPELLANT'S CHECKING ACCOUNT.
 {¶ 60} WOCRA's eighth assignment of error deals solely with its bank, or the drawee bank, Peoples Bank. Essentially, WOCRA claims that the trial court erred in dismissing its breach of contract and negligence claims against Peoples Bank because questions of material fact remain. WOCRA argues that Peoples Bank breached its contract and/or acted negligently by allowing Fast to *Page 33 
unilaterally change its signature card's two signature requirement down to one signature. In support of its argument, WOCRA points to the language on its signature card that states that Peoples Bank "usually" requires separate authorization from an organization before it will allow changes to a signature card. Because it is still in dispute as to whether Peoples Bank exercised ordinary care with regard to WOCRA's account, WOCRA claims that the trial court erred in granting summary judgment to Peoples Bank.
 {¶ 61} To set forth a claim for breach of contract, a complaining party must prove the following elements by a preponderance of the evidence: (1) that a contract existed; (2) that the complaining party fulfilled its contractual obligations; (3) that the opposing party failed to fulfill its obligations; and (4) that the complaining party incurred damages as a result of this failure. Farmers State Bank v.Followay, 9th Dist. No. 07CA0011, 2007-Ohio-6399, ¶ 13, citingLawrence v. Lorain Cty. Community College (1998), 127 Ohio App.3d 546,548-49, 713 N.E.2d 478. In addition, with respect to interpreting contracts, "courts will give common words in a written instrument their plain and ordinary meaning, unless an absurd result would follow or there is clear evidence of another meaning from the face or overall contents of the instrument." Cooper Tire Rubber Co. v. WarnerMechanical Corp., 3d Dist. No. 5-06-39, 2007-Ohio-1357, ¶ 10, citing *Page 34 Alexander v. Buckeye Pipe Line Co. (1978), 53 Ohio St.2d 241,374 N.E.2d 146, paragraph two of the syllabus.
 {¶ 62} Here, WOCRA is relying on its signature card as the basis for its breach of contract claim against Peoples Bank. The signature card for the WOCRA checking account with Peoples Bank was signed by Arnold Fast and Gerald W. Bollenbacher. In addition, the card provided as follows:
 Agreement — These terms govern the operation of on forms approved by us. . .
 Ownership of Account and Beneficiary Designation — . . . Corporate, Partnership, and other Organizational Accounts — We will usually require a separate authorization form designating the person permitted and conditions required for withdrawal from any account in the name of a legal entity such as a partnership, corporation, or other organization. . .
The language of the card expressly states that Peoples Bank will "usually" require a separate authorization for changes, but the term "usually" does not make such a requirement mandatory. Therefore, since WOCRA cannot show Peoples Bank failed to fulfill an obligation it contractually owed WOCRA, we find that summary judgment was properly granted to Peoples Bank on the breach of contract claim. *Page 35 
 {¶ 63} To establish a valid claim for negligence, WOCRA had to demonstrate that (1) a duty was owed to it by Peoples Bank, (2) the duty was breached, (3) an injury resulted, and (4) the breach of the duty was the proximate cause of the injury. Huntington Natl. Bank v.Kazmaier, 175 Ohio App.3d 130, 2008-Ohio-603, 885 N.E.2d 314, ¶ 18, citing Armstrong v. Best Buy Co., Ins., 99 Ohio St.3d 79,2003-Ohio-2573, 788 N.E.2d 1088, ¶ 8. Because WOCRA had its checking account with Peoples Bank, Peoples Bank owed it a duty to act in good faith and to exercise ordinary care. See R.C. 1304.03. Ordinary care is defined in R.C. 1303.01(A)(9), which defines it as:
 [the] observance of the reasonable commercial standards that are prevailing in the area in which the person is located with respect to the business in which the person is engaged. In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures, and the bank's procedures do not vary unreasonably from general banking usage not disapproved by this chapter or Chapter 1304. [sic] of the Revised Code.
 {¶ 64} The trial court found that WOCRA had failed to demonstrate what the accepted banking practices were for changes made to signature cards, thus failed to show how Peoples Bank fell below such a standard, and therefore, failed to raise any genuine issues of material fact with regard to its negligence claim against Peoples Bank. On appeal, WOCRA asserts that the trial court erred in its conclusion, and that questions of fact still remain on that issue. Specifically, *Page 36 
WOCRA claims that the affidavit of Keith Selhorst, submitted by Peoples Bank in support of its motion for summary judgment and relied on by the trial court, was self-serving. In addition, WOCRA argues that a jury should make the determination as to whether Peoples Bank breached its standard of care.
 {¶ 65} At his deposition, Fast testified that when he had first taken the job with WOCRA, it had been his idea to require two signatures on checks drawn on WOCRA's account for over $1,000. (Fast Depo. at 60) Fast further stated that Bollenbacher was the other authorized signature on the account, but that he would at times just sign a group of checks and give them to Fast to use at his discretion. (Id. at 59-60, 101). Some of these checks that Bollenbacher co-signed, Fast made payable to himself. (Id. at 101-02). In addition, Fast admitted that he was the one that had changed WOCRA's signature card two signature requirement down to one signature requirement several years previously, but that no one at WOCRA ever objected to his decision. (Id. at 59-60, 111).
 {¶ 66} In regards to the organization's overall structure, Fast testified that according to WOCRA's bylaws, the directors were suppose to meet twice a year, but because it could never get a quorum for its May meeting, the organization dropped the May meetings. (Id. at 104). Fast was also the one responsible for keeping the organization's records, such as notes and minutes of meetings. (Id. at 105-06). He further stated that for the meetings that the organization had, Fast *Page 37 
gave all the directors a book of information about the organization's finances. (Id. at 106). However, Fast stated that the organization's financial and corporate documents were no longer available because they had been destroyed in a fire. (Id. at 105-06). Ultimately, Fast testified that there were never any procedures in place to oversee his work, and that the organization never ran any kind of audit while he was there from 1992 until 2004. (Id. at 100, 107).
 {¶ 67} The current president for WOCRA at that time, Dennis Fricke, was also deposed by the parties. While he testified that WOCRA was not incorporated, he did state that the organization had bylaws and a constitution and was governed by a state statute. (Fricke Depo. at 8, 57). He also acknowledged that the directors of WOCRA typically only met once a year. (Id. at 25). Nevertheless, he said that only the bylaws existed as WOCRA's procedures, but that no other written policies were in place during this time. (Id. at 62-63). Moreover, he admitted that WOCRA's only oversight system on Fast's positions was the two signature requirement on its signature card at Peoples Bank. (Id. at 40). In addition, he stated that the organization did not have any formal procedures for an independent or internal audit until after it had discovered Fast's embezzlement in 2004. (Id. at 40). As a result, now WOCRA performs a yearly audit, receives monthly bank statements and financial reports, and enforces its original two signature requirement on all of its checks. (Id. at 79-80). *Page 38 
 {¶ 68} In support of its motion for summary judgment, Peoples Bank submitted an affidavit from Keith Selhorst, the auditor of Peoples Bank. In his affidavit, Selhorst stated that the bank maintains signature cards to prescribe who has authorization to write checks on bank accounts. (Selhorst Aff. at ¶ 3). With respect to WOCRA, Selhorst testified that its signature card was last changed on February 16, 1994, and that Fast and Bollenbacher both appeared to authorize only one signature on all future checks drawn on WOCRA's account. (Id. at ¶ 5). Selhorst stated that this change was accomplished in conformity with the standards used at Peoples Bank and other community Ohio banks. (Id. at ¶ 6). Moreover, he testified that Peoples Bank had no knowledge that Fast was breaching his duty to WOCRA, but that statements were mailed on a monthly basis to a representative at the organization. (Id. at ¶¶ 10-11).
 {¶ 69} After reviewing all of the evidence, we believe that the trial court was correct in granting Peoples Bank's motion for summary judgment. WOCRA offered no specific evidence that Peoples Bank's actions were not in conformity with the Federal Regulations, clearinghouse rules and regulations, or general banking usage. RDH Enterprises, Inc. v.Farmers Merchants Bank, 2nd Dist. No. 19934, 2003-Ohio-6247, ¶ 27. In fact, there was evidence from Selhorst that allowing Fast to change the signature card when he was already an authorized signatory was accomplished in conformity with the standards used at Peoples *Page 39 
Bank and other Ohio banks. (Selhorst Aff. at ¶ 6). WOCRA claims that Selhorst's affidavit was self-serving, but it has not specifically alleged any wrongdoing nor has it presented any evidence to refute his statements.
 {¶ 70} Moreover, this Court notes that if any party was negligent in this case it was WOCRA. Not only did the organization not have any formal procedures in place to oversee Fast's work as treasurer/secretary, but it never ran any kind of audit for at least twelve years. The only "security" measure WOCRA can point to is the signature card's two signature requirement on all checks written for more than $1,000. However, even this security feature was ineffective when it was still in place since WOCRA's other authorized signature (Bollenbacher) apparently signed blank checks and gave them to Fast to fill out. Importantly, this organization handled roughly three-quarters of a million dollars every year, but for at least twelve years, no one ever questioned Fast regarding the finances. Since this incident in 2004, WOCRA has conducted an audit, and thus far, cannot account for at least $667,297 of its funds. While WOCRA cannot state for sure whether any of this money, besides the $131,000 used for Fast's personal loan with First Financial, was used for a legitimate purpose, the fact remains that no one at the organization knows what happened to the rest of the money. *Page 40 
 {¶ 71} We find that WOCRA has failed to produce any evidence that Peoples Bank violated its duty of ordinary care, and thus, no material questions of fact remain on this issue and summary judgment to Peoples Bank was appropriate.
 {¶ 72} WOCRA's eighth assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. I THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT IN THAT GENUINE ISSUES OF MATERIAL FACT EXIST WHICH PRECLUDE [SIC] SUMMARY JUDGMENT.
 {¶ 73} In its first assignment of error, WOCRA argues that the trial court erred in granting Peoples Bank and First Financials' motions for summary judgment. WOCRA claims that there are genuine issues of material fact as to whether First Financial breached its common law duty and/or acted in bad faith or in a commercially unjustifiable way. In addition, it claims that there exist genuine issues of material fact as to whether Peoples Bank was negligent and/or breached its contract in maintaining WOCRA's checking account.
 {¶ 74} Because this Court has already found that both Peoples Bank and First Financial were entitled to summary judgment as to all the claims asserted against them by WOCRA, and WOCRA has failed to allege any new arguments as to why we should find otherwise in this assignment of error, we likewise find that its arguments here are meritless.
 {¶ 75} Therefore, WOCRA's first assignment of error is overruled. *Page 41 
 {¶ 76} In conclusion, having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed
 SHAW, J., concurs.
 ROGERS, J., dissents as to Assignments of Error Nos. 1, 3, 4, 5, 6, 7and 8; and concurs as to Assignment of Error No. 2.
[1] This Court notes that there is case law which suggests that parties may not assert common law causes of action in the context of commercial paper, since the U.C.C. presumably supplants the law governing all commercial paper transactions. See Olympic Title Ins. Co.v. Fifth Third Bank of Western Ohio, 2nd Dist. No. 20145,2004-Ohio-4795, ¶ 13; Natl. City Bank v. Citizens Natl. Bank ofSouthwest Ohio, 2nd Dist. No. 20323, 2004-Ohio-6060, ¶¶ 24-30; AmzeeCorp. v. Comerica Bank-Midwest, 10th Dist. No. 01AP-465, 2002-Ohio-3084, ¶¶ 47-52. However, since neither party raised this issue before this Court, we decline to address this particular issue now on appeal.
[2] Negotiation of bearer paper means that anyone in possession can negotiate the instrument by transfer of possession alone, rather than when an instrument is made payable to the order of a payee, which requires transfer of possession of the instrument and its endorsement by the holder. R.C. 1303.21(B)
[3] Since its effective date on January 1, 2007, the Uniform Fiduciary Act has now been re-codified in R.C. Chapter 5815, but for purposes of this appeal, this Court will analyze the UFA under its old section numbers. *Page 1