SAVIN, Appellant,

v.

CENTRAL TRUST COMPANY, N.A., n.k.a. PNC Bank Ohio, N.A., Appellee.

[Cite as *Savin v. Cent. Trust Co., N.A.* (1995), 106 Ohio App.3d 465.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C-940817.

Decided Sept. 27, 1995.

466

*Santen & Hughes, William E. Santen* and *Edward E. Santen,* for appellant.

*Strauss & Troy, R. Guy Taft* and *Stuart C. Brinn,* for appellee.

---

PAINTER, Judge.

## I. Facts

Margaret Ryan embezzled over $700,000 from plaintiff-appellant Ronald Savin's business, Premium Finishes, Inc. ("PFI"), between May 1987 and November 1990. Ryan was PFI's treasurer during this period of time and was responsible for PFI's regular checking account ("the account") at Central Trust. In her capacity as treasurer, Ryan wrote as many as two hundred fifty checks to the Wyoming branch of Central Trust Company, N.A., n.k.a. PNC Bank Ohio, N.A. ("Central Trust") for cash. Ryan made out these checks as payable to Central Trust and exchanged them for cash.

While the parties dispute the ramifications of the following acts and authorizations, the record reflects different periods of time during which Ryan had different authority for manipulating the account. Prior to September 1987, Ryan was not listed on either signature cards or corporate resolutions as an authorized signer for the account. However, between May 1987 and September 1987, Ryan signed and cashed twenty-four checks totalling $17,058.81.

Until 1987, PFI had required two signatures of its officers to withdraw money from the account. On September 11, 1987, Savin, as president of PFI, personally reduced the required signatures to one via signature card. A corresponding corporate resolution, also dated September 11, 1987, was signed by Ryan as secretary; however, she was the treasurer, not the secretary, and unauthorized to sign the resolution. Savin stated that he made Ryan the sole authorized signer for the account because he and his wife were away up to six months of the year and he did not believe that Ryan could steal from PFI with the accountant "serving as a watchdog." However, Ryan was authorized both to write the checks and to reconcile the returned checks in the company books. Because she used bogus entries for the reconciliations, the accountant was unable to discover the embezzlement by simply looking at the books.

Another signature card and corporate resolution were submitted to Central Trust March 10, 1988, to change one of the authorized signatures, but Ryan still was listed as an authorized signer. These documents were signed by Savin and PFI secretary Gloria Savin, respectively. Therefore, three distinct periods of time must be examined to determine the scope of Ryan's authority: prior to September 11, 1987, between September 11, 1987, and March 10, 1988, and after March 10, 1988.

Central Trust discovered Ryan's embezzlement and promptly reported it in November 1990. The Hamilton County Court of Common Pleas convicted Ryan for the embezzlement in 1991.

In March 1991, Savin sold PFI to Hunting Specialty Products, Inc., but retained the right to continue to prosecute the instant action against Central Trust. After PFI first brought an action against Central Trust in 1991 and voluntarily dismissed the action in 1992, Savin filed this action against Central Trust in June 1993, asserting three claims. Savin claimed that (1) Central Trust breached contractual obligations as payee of the checks that Ryan cashed; (2) Central Trust was negligent in tort for treating the checks as bearer paper rather than as order paper; and (3) Central Trust breached its fiduciary duty to Savin and PFI. The trial court granted summary judgment in favor of Central Trust, and Savin brings this appeal.

## II. Assignment of Error

In his sole assignment of error, Savin argues that the court erred in granting summary judgment. Savin makes four arguments. First, Savin argues that there are genuine issues of material fact regarding the fiduciary status of Ryan, the documentation at Central Trust, and the "commercial reasonableness" of Central Trust's payments to Ryan on the account. Second, Savin argues that a holder in privity to parties to an instrument is also the payee and not a holder in due course. Third, Savin argues that there are genuine issues of material fact regarding the "commercial reasonableness" of Central Trust's conduct when based on a holder-in-due-course defense. Finally, Savin argues that the Uniform Fiduciaries Act insulates a bank from liability only for claims arising under negotiable instruments law, but not from general tort claims such as breach of fiduciary duty.

## III. Ryan's Fiduciary Status

First, Savin argues that there are genuine issues of material fact regarding the fiduciary status of Ryan, the documentation at Central Trust, and the "commercial reasonableness" of Central Trust's payments to Ryan on the account. Savin initially argues that under the common law, Central Trust wrongfully treated the checks payable to "Central Trust" as bearer paper, rather than order paper. Central Trust argues, however, that the Uniform Fiduciaries Act protects it from this claim.

Savin quotes the Ohio Supreme Court's decision in *Master Chem. Corp. v. Inkrott* (1990), 55 Ohio St.3d 23, 25, 563 N.E.2d 26, 28, which stated that:

"If the payee bank assumes, without investigation, that the instructions of the presenter are those of the drawer, the payee bank does so at the risk of

discovering that no such directions were given by the drawer. The payee bank becomes liable for the misdirected funds."

The court clearly indicated that this stated rule is the common-law rule which has been significantly altered by the Uniform Fiduciaries Act. *Id.* at 25, 563 N.E.2d at 29.

The court stated that the Act was developed "to facilitate commercial transactions, by relieving those who deal with authorized fiduciaries from the duty of ensuring that entrusted funds are properly utilized for the benefit of the principal by the fiduciary." *Id.* (citing *Zions First Natl. Bank v. Clark Clinic Corp.* [Utah 1988], 762 P.2d 1090, 1100).

■ Citing *Inkrott*, Savin argues that the Uniform Fiduciaries Act only protects Central Trust if (1) Ryan was a fiduciary, (2) Central Trust had adequate documentation of the scope of Ryan's authority, and (3) Central Trust's actions were "commercially justifiable." However, under our reading of *Inkrott*, Savin must show that Central Trust had actual knowledge of the fiduciary's breach of fiduciary obligations, that the bank had knowledge of sufficient facts that its actions amounted to bad faith, *or* that the fiduciary was indebted to the bank and the funds were applied to that indebtedness. *Id.* at 27, 563 N.E.2d at 30 (citing *St. Stephen's Evangelical Lutheran Church v. Seaway Natl. Bank* [1976], 38 Ill.App.3d 1021, 1023, 350 N.E.2d 128, 129–130).

■ The only one of these three possibilities asserted is that Central Trust had knowledge of sufficient facts that its actions amounted to bad faith. The Act does not define "bad faith," but courts have looked to whether the transaction is "commercially unjustifiable" to determine whether the bank acted in bad faith. *Id.,* 55 Ohio St.3d at 27, 563 N.E.2d at 31. "The facts and circumstances must be so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction." *Id.* (citing *Transport Trucking Co. v. First Natl. Bank in Albuquerque* [1956], 61 N.M. 320, 325, 300 P.2d 476, 479).

■ The *Inkrott* court stated that the Act shields a bank from liability when the bank knows of the existence of the fiduciary relationship and when the fiduciary in fact possesses the authority to conduct the transaction in question. *Id.,* 55 Ohio St.3d at 27, 563 N.E.2d at 31. These tests can be synthesized to determine whether Central Trust acted in a "commercially unjustifiable" manner. If Central Trust (1) knew that Ryan was a fiduciary of PFI and (2) knew that Ryan possessed the authority to conduct the transactions, then Central Trust could only be held liable if (3) the surrounding facts were so obvious that for Central Trust to remain passive amounted to a deliberate desire to evade knowledge because inquiry would disclose a defect in the transactions.

■ The Uniform Fiduciaries Act section defining "fiduciary" includes agents, officers of corporations or any person acting in a fiduciary capacity. R.C. 1339.03(B). A person acting in a fiduciary capacity is a person having a duty created by his or her undertaking to act primarily for the benefit of another in matters connected with his or her undertaking. *Haluka v. Baker* (1941), 66 Ohio App. 308, 312, 20 O.O. 136, 138, 34 N.E.2d 68, 70.

■ Ryan became the bookkeeper of PFI beginning in May 1987. Ryan was first listed at Central Trust as the treasurer of PFI on a signature card dated September 11, 1987, and signed by Savin. The record is unclear when Ryan was elevated from bookkeeper to treasurer, or whether these two titles described the same position. However, Savin explicitly stated that Ryan was authorized to withdraw funds from the account and transact business on the account. Therefore, with respect to the account, Savin repeatedly admitted in the record that Ryan was able to manipulate the account for PFI. In this capacity, Ryan was clearly an agent for PFI; hence, she was a fiduciary. Even without this admission, we can be certain that after the signature card was signed by Savin and submitted September 11, 1987, Ryan served as a fiduciary of PFI with respect to the account.

■ Conversely, for that period *prior* to September 11, 1987, we find nothing in the record that indicates that Ryan was a fiduciary of PFI in conjunction with the account. She was not an authorized signer. However, Central Trust asserts that R.C. 1304.29 bars recovery for nonfiduciaries by operation of a one-year statute of limitations. R.C. 1304.29 was substantively changed and renumbered effective August 19, 1994. See R.C. 1304.35(F). However, we must use the statute prior to the change to avoid retrospective application of the new statute in this case. R.C. 1304.29(F), prior to August 19, 1994, stated that "[a]n action against a bank arising out of an unauthorized signature or indorsement of the item must be brought within one year after the customer has notified the bank of his claim as required by the provisions of this section." Therefore, Savin is precluded from asserting a claim for the period prior to September 11, 1987, unless the savings clause under R.C. 2305.19 applies.

■ Central Trust argues that the savings clause does not apply to the facts of this case. R.C. 2305.19 allows a one-year extension for the refiling of an action where the statute of limitations has expired and the new action is "substantially the same." Central Trust asserts that the case at bar has a different plaintiff, Savin rather than PFI, and therefore is not "substantially the same."

Savin argued below that the savings clause must apply to avoid a "farcical" result. In his view, to hold otherwise in the context of this case would mean that only PFI, which no longer had standing, could have advanced the claim in the

refiled action to make it "substantially the same," because PFI was the only one to file the claim within the statute of limitations initially. Savin also stated below that Savin "should have been included as a plaintiff in [the January 1991] suit."

Under R.C. 2305.19, the Supreme Court of Ohio has required that the original action and the new action must be substantially the same. *Children's Hosp. v. Ohio Dept. of Public Welfare* (1982), 69 Ohio St.2d 523, 23 O.O.3d 452, 433 N.E.2d 187. The court held that the actions are not the same when the parties are different. *Id.* (citing *Larwill v. Burke* [1900], 19 Ohio C.C. 449, affirmed without opinion, 66 Ohio St. 683, 65 N.E. 1130; *Natl. Fire Ins. Co. v. Joslyn Mfg. Co.* [1971], 25 Ohio App.2d 13, 54 O.O.2d 9, 265 N.E.2d 791). While perhaps Savin *should* have been included, it would not be enough to save the action here. Only PFI, the original plaintiff, could bring the action under the savings clause, and only if the action brought was identical to the original action. Because neither is the case, the savings clause does not apply.

Savin brought this action more than two and one half years after discovering Ryan's embezzlement. Because Ryan was not a fiduciary on the account for PFI prior to September 1987, R.C. 1304.29(F) (now R.C. 1304.35[F]) precluded PFI from bringing an action against the bank for Ryan's unauthorized signature. Therefore, Savin is barred from recovering for the checks cashed without authority by the one-year statute of limitations of R.C. 1304.29(F).

 As previously noted, Ryan was a fiduciary of PFI for the period after September 11, 1987. We must determine whether Ryan also possessed the authority to cash the checks.

On September 11, 1987, a validly signed signature card and an improperly executed corporate resolution were submitted to Central Trust. Another valid signature card and valid corporate resolution were submitted to Central Trust March 10, 1988. These documents determined the scope of Ryan's authority with respect to the Central Trust account.

Both the September 11, 1987, and the March 10, 1988, signature cards stated that "[d]epositor hereby authorizes bank to recognize any 1 of the following signatures in the withdrawal of funds from or transactions of other business on this account."

Each card then listed valid signatures: four signatures, including "Margaret D. Ryan," on the September card, and five valid signatures, including "Margaret D. Ryan," on the March card. Both cards were signed by Savin in his capacity as president of PFI.

The September 11, 1987 corporate resolution stated in paragraph two that:

"Resolved, further, that all drafts, checks and other instruments or orders drawn against the regular 001009699 account(s) of this corporation in the said depositary shall be signed by 1 of the following: Vice President, Vice President, Controller, President and * * * that the Bank is hereby authorized to accept or pay or apply, * * * any draft, check, instrument or order for the payment of money drawn on such account or accounts which bears the signature or signatures now or hereafter authorized including such as may be to the order of any person whose signature appears thereon * * *."

At the end of the resolution, the names of those authorized included "Margaret D. Ryan" as "Treasurer." This resolution was signed by Ryan as secretary, when she was otherwise clearly listed as treasurer. The record does not adequately indicate why Ryan signed instead of Gloria Savin, the secretary of PFI. However, Ronald Savin repeatedly indicated during his deposition testimony that Ryan was intended to be given authority to conduct transactions with the account as the sole authorized signer.

The March 10, 1988 corporate resolution had the same language as the previous resolution. However, PFI left blank the area in paragraph two that required the listing of who was authorized to sign checks. Instead, a list was given in the next paragraph, authorizing loans, advances, and lines of credit by those listed. This subsequent paragraph did not include a number of signatures required to enter these transactions. This resolution was validly signed by the secretary, Gloria Savin. Central Trust accepted these resolutions to indicate, as PFI intended, that Ryan had actual authority to withdraw funds and transact business with the account. Savin repeatedly admitted in his deposition that Ryan did have that actual authority. The ability of Ryan to make use of the account from May 1987 to November 1990 without complaint by PFI or Savin further substantiates Ryan's actual authority with respect to the account.

The only remaining issue is whether the surrounding facts were so obvious that for Central Trust to remain passive amounted to a deliberate desire to evade knowledge because inquiry would disclose a defect in the transactions. Here, the apparently invalid corporate resolutions bring Central Trust's actions into question. G. Carlton Hill, Jr., an expert in banking practices, stated that standard banking practices require a bank to acquire a valid signature card for those signatures authorized on the account as evidenced by a corporate resolution certified by an officer. The September 11, 1987 resolution was not certified by an officer. Instead, it was signed by Ryan, the embezzler. The March 10, 1988 resolution was signed and certified, but the area designating those authorized on the account was left blank, with the names inadvertently appearing elsewhere. Thus, standard practices were not followed. In Hill's opinion, that failure was "commercially unreasonable."

However, to be commercially unjustifiable, the errors in the corporate resolutions ignored by Central Trust would have to lead to the discovery of a defect in the transactions. See *Inkrott, supra.* Instead, the errors would have simply been corrected, because as we have already observed, Ryan was an authorized fiduciary on this account. Unlike the bank in *Inkrott,* Central Trust did not transfer money from the account to Ryan's personal account. Central Trust had no knowledge of what purpose an authorized signer of PFI might have for the cash, and fulfilled its obligation by sending monthly bank statements to PFI, fully disclosing the transactions on the account. PFI negligently failed to ensure that those statements were correctly reconciled with the checks because Ryan fulfilled both functions for PFI. Ryan altered the entries to fraudulently reconcile the checks and the accounts payable. The most Central Trust could have done, in light of all of the cash that Ryan was withdrawing, would have been to notify other PFI officers of the suspicious cash withdrawals. Central Trust failed to notify PFI that Ryan was doing what she was authorized to do: withdrawing funds from the account. Ryan's actions did not rise to the level of being "so obvious" that for Central Trust to remain silent amounted to a deliberate desire to evade knowledge because inquiry would disclose a defect in the transactions, when Central Trust did not know where the money was going, as was the case in *Inkrott.* Therefore, Central Trust's actions, while not optimal, were not commercially unjustifiable under the Uniform Fiduciaries Act.

For these reasons, the first issue advanced by Savin does not render the court's entry of summary judgment erroneous.

## IV. Holder in Due Course

In his second issue, Savin argues that if a holder in privity to parties to an instrument is also the payee, that holder is not a holder in due course. A holder in due course is a holder who takes a negotiable instrument for value, in good faith, and without notice of any claims or defenses otherwise available to the person obligated on the note. R.C. 1303.31. Holders in due course acquire good title which deserves protection from claims or defenses presented by the obligor.

Savin argues that Central Trust was not a holder in due course because Central Trust dealt directly with PFI. R.C. 1303.34(B); *Bank One v. Myers* (1984), 14 Ohio App.3d 196, 14 OBR 215, 470 N.E.2d 485. R.C. 1303.34 was substantively changed and renumbered effective August 19, 1994. See R.C. 1303.32. Again, we must use the statute prior to the change to avoid retrospective application of the new statute in this case. R.C. 1303.34(B), prior to August 19, 1994, stated that a holder in due course took free from all *defenses* only when the holder had not dealt with that party. R.C. 1303.34 also stated that holders in

due course took free from all *claims*, without any privity qualification. See, also, *G.F.D. Enterprises, Inc. v. Nye* (1988), 37 Ohio St.3d 205, 525 N.E.2d 10.

In this case, Ryan, as PFI's treasurer, was the holder in privity with Central Trust. Therefore, PFI could assert personal defenses against Central Trust, but not claims. Central Trust vigorously argues that Savin was asserting a claim, not a defense. We agree. Savin was bringing an action against Central Trust to recover embezzled funds. This is vastly different from Central Trust bringing an action against PFI to recover on a dishonored check. In the latter case, PFI could assert personal defenses. However, in this case, Central Trust, as a holder in due course, took the checks free from all claims asserted by Savin.

Therefore, this issue does not prevent the entry of summary judgment for Central Trust.

### V. "Commercial Reasonableness"

In raising his third issue, Savin argues that there are genuine issues of material fact regarding the "commercial reasonableness" of Central Trust's conduct when based on a holder-in-due-course defense. Savin argues that Central Trust did not act in good faith, because it did not act with commercial reasonableness, asserting the "bad faith" standard under *Inkrott*.

We have already stated that Central Trust acted in good faith because any failure did not rise to the level of being "so obvious" that Central Trust could have harbored a deliberate desire to evade knowledge because inquiry would disclose a defect in the transactions.

Central Trust argues that the "bad faith" standard is wholly inapplicable to holders in due course. We agree. The Ohio Supreme Court held simply that a holder in due course acted in good faith where it acted "honestly." *Nye, supra.* Therefore, commercial reasonableness is the wrong standard for deciding whether Central Trust acted in good faith under the holder-in-due-course doctrine.

Savin next argues that Central Trust had enough facts to constitute notice of PFI's claims. We disagree. As in *Nye*, the mere arousal of suspicion by the circumstances alone is insufficient notice, or knowledge, of a claim. *Id.* We cannot find any evidence in the record that would suggest that Central Trust did not act "honestly."

Therefore, this issue fails to invalidate the trial court's entry of summary judgment.

### VI. Uniform Fiduciaries Act

In his final issue, Savin argues that the Uniform Fiduciaries Act insulates a bank only from liabilities on claims arising under negotiable instruments

law, but not from general tort claims such as breach of fiduciary duty. Savin argues, in effect, that because the Uniform Fiduciaries Act does not explicitly indicate that it absolves a bank from its fiduciary duties that arise outside of commercial law, the Act does not apply in this case. Savin cites no authority for this proposition. The Uniform Fiduciaries Act is designed to relieve "those who deal with authorized fiduciaries from the duty of ensuring that entrusted funds are properly utilized for the benefit of the principal by the fiduciary." *Inkrott, supra,* 55 Ohio St.3d at 26, 563 N.E.2d at 29. Such is the case at bar.

In *Nye,* the Ohio Supreme Court recognized the difficulty presented by Savin. The court held that while such "a claim sounding in tort has its genesis outside the UCC" once an action is brought, "the UCC will govern the rights and liabilities of the parties in such action." *Nye, supra,* 37 Ohio St.3d at 212, 525 N.E.2d at 17. Likewise, no such restriction applies to the Uniform Fiduciaries Act, and this issue has no merit.

## VII. Conclusion

When its actions are viewed against PFI's negligence in allowing Ryan to perform all of the bookkeeping tasks, to manipulate the account as the sole signer, and to reconcile the books, Central Trust can clearly be seen to have acted significantly more reasonably than PFI. For the reasons stated above, Savin has not asserted a compensable claim against Central Trust as a matter of law. Therefore, his sole assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

GORMAN, P.J., and MARIANNA BROWN BETTMAN, J., concur.