RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0163p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

VIVY VOUTSIOTIS, Executor of the Estate of George Voutsiotis, GEORGE KARVOUNIDES, Individually and as Custodian of an Account for benefit of Eleftheria Varvaras; G&Y GROUP, LLC; ANNA KARVOUNIDES; YIANNI KARVOUNIDES; CORROSION RESISTANCE, LTD; GAADY, LLC; EVANGELOS VARVARAS; ANGELA VARVARAS; DINA KARVOUNIDES; ALEXANDRA VOUTSIOTIS; GOUDAS ENTERPRISES, LTD; CONSTANTINE BITOUNIS; GUS PYROS; HARALAMBOS GONOS; SOPHOCLES SOPHOCLEOUS; SUSAN GEORGE; TIMOTHY MOFF; KARVO COMPANIES, INC., dba Karvo Paving Company; AUCTUS PROPERTIES, LLC; SPARKLING SPIRITS ENTERTAINMENT, LLC,

　　　　　　　　　　　　　*Plaintiffs-Appellants,*

No. 25-3826

　　　*v.*

PNC BANK, NA; DEMETRIOS P. KOUTRODIMOS,

　　　　　　　　　　　　　*Defendants-Appellees.*

─────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:23-cv-02305—J. Philip Calabrese, District Judge.

Argued:  April 29, 2026

Decided and Filed:  June 8, 2026

Before:  SUTTON, Chief Judge; DAVIS and RITZ, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Richard C. Haber, HABER LLP, Pepper Pike, Ohio, for Appellants.  Andrew R. Stanton, JONES DAY, Pittsburgh, Pennsylvania, for Appellees.  **ON BRIEF:**  Richard C. Haber, Lindsey K. Self, Natalie D. Davis, HABER LLP, Pepper Pike, Ohio, for Appellants.  Andrew R. Stanton, Susan E. Kessler, Daniel Paul Johnson, JONES DAY, Pittsburgh, Pennsylvania, Joseph C. Barry, JONES DAY, Cleveland, Ohio, for Appellees.

---

**OPINION**

---

SUTTON, Chief Judge.  Constantine Antonas founded a pair of investment companies and created accounts for them at PNC Bank.  Investors trusted Antonas with millions.  But he lost the money through poor investments, and he lied to cover it up.  After his scheme came to light, a group of the investors filed this lawsuit against PNC and a PNC employee in state court.  PNC removed the case to federal court, arguing that the investors joined the PNC employee fraudulently, which precluded his presence from destroying federal diversity jurisdiction.  *See* 28 U.S.C. § 1332.  The district court agreed, denied the investors' motion to remand to state court, and dismissed the lawsuit for failure to state a claim.  We agree and affirm.

I.

In the autumn of 2013, Constantine Antonas founded Antonas Capital Management, LLC, and Epitome Investment Fund, LP.  He began advertising his services as an investment advisor to fellow members of northeast Ohio's Greek Orthodox community, eventually receiving millions of dollars in investments.  Antonas opened five bank accounts with PNC Bank in support of this venture, three for himself, and one each for Antonas Capital Management and Epitome Investment Fund.  He also created an account with a brokerage firm, Interactive Brokers, LLC.  Antonas told potential investors that he would attempt "to achieve high risk-adjusted returns by utilizing holistic proprietary research while seeking to limit volatility and downside risk."  R.18 ¶ 44.

He did not succeed.  Antonas lost much of his investors' money and, worse, falsified financial documents to hide the failure.  When suspicions arose over what was going on, investors in the fund scheduled a conference with Antonas for October 4, 2021, to reconcile accounts and confirm their balances.  When the appointed time arrived, Antonas did not appear.  Hours earlier, he had killed himself.

Three days after Antonas's death, investors sued his estate, Epitome Investment Fund, and Antonas Capital Management in state court.  *See generally Karvo Companies Inc. v. Antonas*

*Capital Management LLC*, No. CV 2021-10-3176 (Ohio Ct. Com. Pls. Cuyahoga Cnty. Oct. 7, 2021). A year later, a separate set of plaintiffs filed a lawsuit in state court against other investors and Antonas's parents. *See generally Karvounides v. Antonas*, No. CV-2022-10-3414 (Ohio Ct. Com. Pls. Summit Cnty. Oct. 4, 2022). A third lawsuit, this one against Interactive Brokers, remains pending in the Ohio Supreme Court. *See generally Bitounis v. Interactive Brokers, LLC*, No. 23-113193 (Ohio Sep. 16, 2024).

In October 2023, a group of investors (the Investor Group) filed this lawsuit, the fourth one, against PNC and a set of PNC employees in Ohio state court. They claim that Antonas worked with PNC employee Demetrios Koutrodimos, a friend and fellow member of the northeast Ohio Greek Orthodox community. They add that Antonas "changed his banking behaviors and began to transfer funds in a manner which was inconsistent with usual business practices, and which did not match Antonas' normal pattern of activity." R.18 ¶ 59. The complaint says that PNC employees, including Koutrodimos, "were required to approve [Antonas's] wire transfers." R.18 ¶ 65. From there, it claims that Koutrodimos and other PNC employees knew that Antonas's transactions "were not consistent with the stated business type of Epitome," R.18 ¶ 68, and "lacked evidence of legitimate business activity," R.18 ¶ 66. The complaint raises six causes of action in all against PNC: violations of the Ohio Uniform Fiduciary Act, negligence, fraud, aiding and abetting fraud, civil damages for criminal acts, and civil conspiracy. It also alleges liability against Koutrodimos for the last four claims.

PNC removed the lawsuit to federal court, alleging that no colorable cause of action existed against Koutrodimos, the sole non-diverse defendant, and claiming a right to defend the lawsuit in federal court. The Investor Group moved to remand. The district court found no colorable liability against Koutrodimos, dismissed him from the lawsuit, and denied the motion to remand. PNC moved to dismiss the lawsuit for failure to state a claim, and the district court granted the motion.

II.

*Motion to remand.* On appeal, the Investor Group argues that the district court wrongly denied its motion to remand the case to state court. The fraudulent-joinder doctrine prevents

artificial circumvention of a defendant's removal right in diversity cases.  Section 1441(a) of Title 28 allows defendants to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction."  Section 1332 of Title 28 grants federal district courts original jurisdiction over lawsuits in which no defendant shares state citizenship with any plaintiff.  *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806).

If a plaintiff could simply join an uninvolved individual from his home state as an additional defendant, he could always block removals premised on complete diversity.  *See Ala. Great S. Ry. Co. v. Thompson*, 200 U.S. 206, 218 (1906).  The federal courts thus do "not sanction devices intended to prevent a removal to a Federal court where one has that right." *Wecker v. Nat'l Enameling & Stamping Co.*, 204 U.S. 176, 186 (1907).  To these ends, we allow a defendant to remove a case to federal court if it demonstrates that the non-diverse plaintiff has no "colorable basis" for obtaining relief.  *Casias v. Wal-Mart Stores, Inc.*, 695 F.3d 428, 433 (6th Cir. 2012) (quotation omitted); *see Chesapeake & O.R. Co. v. Cockrell*, 232 U.S. 146, 153 (1914).

We assess the claim based on "the same standards that we would apply at the pleading stage," *Ohio ex rel. Yost v. Ascent Health Servs., LLC*, 165 F.4th 999, 1004 (6th Cir. 2026), and we "may look to material outside the pleadings for the limited purpose of determining whether there are undisputed facts that negate the claim," *Casias*, 695 F.3d at 433 (quotation omitted). The removing party bears the burden of demonstrating fraudulent joinder.  *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 948–49 (6th Cir. 1994).  We review the district court's factual findings for clear error and its fraudulent-joinder determination with fresh eyes.  *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 492 (6th Cir. 1999).

Because the complaint does not state a colorable claim against Koutrodimos, the district court correctly denied the motion to remand.  The plaintiffs reside in Ohio, Massachusetts, and Florida.  They assert claims against PNC (a federally chartered bank with its principal place of business in Pennsylvania) and Demetrios Koutrodimos (an Ohio citizen).  The four claims against Koutrodimos fall well short of colorable, as a review of each claim confirms.

*Common law fraud.* Ohio common law fraud requires: (1) a representation or (where there is a duty to disclose) a concealment of fact, (2) which is material, (3) made falsely and with knowledge of its falsity or with utter recklessness to its falsity, (4) with the intent of misleading another, (5) justifiable reliance, and (6) injury proximately caused by the reliance. *Williams v. Aetna Fin. Co.*, 700 N.E.2d 859, 868 (Ohio 1998).

The parties agree that Rule 9(b) of the Federal Rules of Civil Procedure sets the pleading standard for the fraud claim against Koutrodimos. *See Berk v. Choy*, 607 U.S. 187, 192 (2026). Fraud by nature encompasses "a wide variety of potential conduct." 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1296 (4th ed. 2025). To provide defendants with notice of the misconduct alleged, and to prevent plaintiffs from speculatively rummaging through defendants' affairs without adequate cause, Rule 9(b) requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007). A complaint satisfies that standard when it alleges "(1) the time, place, and content of the alleged misrepresentation, (2) the fraudulent scheme, (3) the defendant's fraudulent intent, and (4) the resulting injury." *Wall v. Mich. Rental*, 852 F.3d 492, 496 (6th Cir. 2017) (quotation omitted). The rule, in essence, "demands specifics" rather than "inferences and implications." *United States ex rel. Hurt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017). Fraud claims that fail to satisfy this heightened pleading standard cannot defeat an allegation of fraudulent joinder. *See, e.g.*, *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 889, 892 (5th Cir. 2024); *cf. Casias*, 695 F.3d at 433 (assessing fraudulent joinder using a standard "similar to" Civil Rule 12(b)(6)).

Gauged by this test, the fraud allegations against Koutrodimos do not suffice. The complaint, most fundamentally, never identifies "the time, place, and content" of a single false representation made by Koutrodimos, much less one made with misleading intent. *See Wall*, 852 F.3d at 496 (quotation omitted). The complaint fails to discuss a single representation of any kind made by Koutrodimos to the plaintiffs or for that matter anyone else. While the complaint alleges that the plaintiffs relied on representations made by PNC, it says nothing about reliance on anything Koutrodimos did or said. The complaint's assertion that Koutrodimos knew of Antonas's unusual transactions likewise comes up short of a statement, or even of a conclusory

allegation, that Koutrodimos knew of Antonas's fraud. The complaint instead merely alleges that Koutrodimos and Antonas shared a friendship, an ethnicity, and a church, and that Koutrodimos opened a bank account at PNC for Antonas at Antonas's request. From there, it simply asserts that Koutrodimos was "required to approve" (and thus knew about) Antonas's purportedly suspicious transactions. R.18 ¶¶ 64–65. Working for a company that provides banking services to an inept investor does not constitute fraud, and the Investor Group alleges nothing more with respect to Koutrodimos.

"[U]ndisputed facts" provide an independent basis for establishing the deficiency of the fraud claims. *Casias*, 695 F.3d at 433. PNC submitted affidavits from Koutrodimos and another bank executive, both stating unequivocally that Koutrodimos never had formal or informal responsibility for any of Antonas's accounts. Both affidavits underscore that no PNC rule or legal obligation conveyed that Koutrodimos had to approve any of Antonas's transactions. Because undisputed evidence indicates that Koutrodimos worked not as an adjunct to Antonas's fraudulent transactions but merely as an employee at PNC, no genuine fact dispute exists over whether he furthered the fraud.

The Investor Group tries to counter this conclusion in several ways. It argues that Koutrodimos's signature block—"As your Relationship Manager, I commit to make banking easy for you by delivering exceptional service"—creates a fact dispute over whether he had formal responsibility for Antonas's accounts and transactions. R.7-4 at 2. But this boilerplate signature block for all of Koutrodimos's emails does not show he knew about the fraud scheme. In January 2018, for instance, Koutrodimos emailed coworker Kelley Barabas about a deposit with the same signature block. In doing so, Koutrodimos, quite obviously, never acted as Barabas's Relationship Manager, never made banking easy for her, and never delivered her exceptional (or unexceptional) service. The rote repetition of form language that appeared in every one of Koutrodimos's emails does not create a dispute of fact about his relationship with Antonas.

The Investor Group turns to other communications: an email in which Koutrodimos informs Antonas of routine fees for wire transfers, an email from Koutrodimos to a coworker about clearing a cashier's check deposited by Antonas, and two other emails from Koutrodimos

to Antonas (one connecting Antonas to a woman interested in manufacturing medical devices, and one forwarding an off-the-shelf investment brochure). These emails do not reveal fraudulent misrepresentations by Koutrodimos or relate to fraudulent transactions by Antonas. They do not suggest anything more than the ordinary, arm's length provision of conventional banking services that defined their relationship. And they do not remotely create a material fact dispute over Koutrodimos's involvement in Antonas's fraud.

The Investor Group insists that the absence of a specific misrepresentation by Koutrodimos does not matter because the lawsuit ultimately rests on fraudulent concealments of fact. The theory is that Ohio law obligated Koutrodimos to inform the plaintiffs of Antonas's suspicious transactions. This approach, too, collapses quickly. A failure to disclose information supports a fraud claim under Ohio law in two scenarios: (1) when there exists a "fiduciary or other similar relation[ship] of trust and confidence," *Universal Real Est. Sols., Inc. v. Snowden*, 26 N.E.3d 1272, 1276 (Ohio Ct. App. 2014) (quotation omitted); and (2) when "the non-disclosing party knows that the failure to disclose such information to the other party will render a prior statement or representation untrue or misleading," *State v. Warner*, 564 N.E.2d 18, 40 (Ohio 1990). A real estate broker, for instance, who tells buyers that a house makes "a good solid home" must inform them if he learns that termites infested the property. *Miles v. Perpetual Sav. & Loan Co.*, 388 N.E.2d 1367, 1370 (Ohio 1979).

Neither rule applies to Koutrodimos. The members of the Investors Group had no business relationship with PNC, much less a fiduciary relationship with Koutrodimos. *See Huntington Nat'l Bank v. Schneider*, 269 N.E.3d 226, 231 (Ohio 2025). And Koutrodimos never guaranteed anything about Antonas's financial transactions or told the plaintiffs anything about procedures to avoid financial improprieties. *See Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1269–70 (Ohio Ct. App. 1996). So far as the complaint goes, he never said anything to the plaintiffs at all. Because the complaint fails to allege either a fiduciary relationship between Koutrodimos and the Investor Group or a "prior statement or representation" by Koutrodimos, the Investor Group may not save its claims by swiveling to a misrepresentation theory. *See First Nat'l Bank of Toledo v. Stewart Petroleum & Drilling*, No. L-84-017, 1984 WL 6612, at *4 (Ohio Ct. App. Aug. 17, 1984) (per curiam).

*Aiding and abetting fraud.* Ohio does not recognize the tort of aiding and abetting fraud, which pulls the legs out from under the Investor Group's second claim. We determine the meaning of state law by reference to the decisions of its highest court. *Peterson v. Johnson*, 714 F.3d 905, 913 (6th Cir. 2013). Where that court has not spoken, "intermediate state appellate court decisions constitute the next best indicia of what state law is." *United States v. Southers*, 866 F.3d 364, 368 (6th Cir. 2017) (quotation omitted). In *DeVries Dairy, L.L.C. v. White Eagle Cooperative Association, Inc.*, the Supreme Court of Ohio declined to "recognize a cause of action for tortious acts in concert." 974 N.E.2d 1194, 1194 (Ohio 2012) (quotation omitted). Decisions of Ohio's intermediate appellate courts have reached the same conclusion before and after *DeVries*. *See Fed. Mgt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio Ct. App. 2000); *Collins v. Nat'l City Bank*, No. 19884, 2003 WL 22971874, at *5 (Ohio Ct. App. Dec. 19, 2003); *Sacksteder v. Senney*, No. 24993, 2012 WL 4480695, at *16 (Ohio Ct. App. Sept. 28, 2012); *Wells Fargo v. Smith*, No. CA2012-04-006, 2013 WL 938069, at *7 (Ohio Ct. App. Mar. 11, 2013). The Investor Group cannot establish colorable liability against Koutrodimos with a cause of action that does not exist.

The Investor Group argues that, for purposes of fraudulent joinder, we must read "ambiguities in the controlling state law" in the light most favorable to the party seeking remand. *Coyne*, 183 F.3d at 493 (quotation omitted); *see Alexander*, 13 F.3d at 949. But after *DeVries*, *Sacksteder* and *Wells Fargo*, Ohio law clearly prohibits this claim. *See Est. of Barney v. PNC Bank, Nat'l Ass'n*, 714 F.3d 920, 929 (6th Cir. 2013).

*Civil Liability for Criminal Acts*. The Investor Group seeks civil liability from Koutrodimos for aiding and abetting theft by deception. This argument also fails. Ohio law criminalizes "knowingly obtain[ing] or exert[ing] control over" property with a "purpose to deprive the owner" of that property. Ohio Rev. Code § 2913.02(A). It separately prohibits aiding and abetting any criminal offense. *Id.* § 2923.03(A)(2). And it imposes civil liability on those who injure others through a criminal act, regardless of whether Ohio convicted them of a crime. *Id.* § 2307.60(A)(1); *see Buddenberg v. Weisdack*, 161 N.E.3d 603, 606 (Ohio 2020). The Investor Group argues that Antonas stole and Koutrodimos helped, establishing a plausible claim against Koutrodimos.

This theory does not make the grade either.  Criminal aider-abettor liability, under Ohio law, requires a party to assist the commission of the crime while "shar[ing] the criminal intent of the principal."  *State v. Johnson*, 754 N.E.2d 796, 801 (Ohio 2001).  For theft, Ohio requires the principal (and thus the aider) to have acted with "purpose" to steal.  Ohio Rev. Code § 2913.02(A).  The Investor Group's complaint falls well short of alleging that heightened form of "criminal intent."  *Johnson*, 754 N.E.2d at 801.  It claims, at worst, that Koutrodimos knew about Antonas's fraud.  Nowhere does the complaint even suggest that he took part in it by intending to steal from the Investor Group.  That alone defeats the claim.  *See Harasyn v. Normandy Metals, Inc.*, 551 N.E.2d 962, 964 (Ohio 1990).

*Civil Conspiracy.*  The Investor Group's civil conspiracy claim fails for substantially the same reason.  The tort of civil conspiracy requires that the defendant purposefully commit the underlying wrong.  *Aetna*, 700 N.E.2d at 868.  The complaint, as discussed, does not adequately allege that Koutrodimos purposefully stole from the Investor Group.

All claims considered, PNC carried its burden of demonstrating the absence of any colorable liability against Koutrodimos.  Without Koutrodimos's citizenship, federal diversity jurisdiction exists over this lawsuit, and PNC permissibly removed it to federal court.

## III.

The district court also correctly granted PNC's motion to dismiss the remaining claims against it.  Ohio's Uniform Fiduciary Act bars all of the claims, and the complaint fails to satisfy Federal Civil Rules 8 and 9(b) anyway.

## A.

The district court properly granted PNC's motion to dismiss based on the Ohio Uniform Fiduciary Act because the Investor Group's "own allegations show that a defense exists that legally defeats the claim for relief."  *Marsh v. Genentech, Inc.*, 693 F.3d 546, 555 (6th Cir. 2012) (quotation omitted).  When a bank cashes or pays out on a check "on the request of a fiduciary," the Ohio Uniform Fiduciary Act eliminates the bank's liability to the fiduciary's principal.  Ohio Rev. Code § 5815.06; *see id.* § 5815.08.  The Act has two exceptions.  If the bank acted with

"actual knowledge that the fiduciary is committing a breach of the obligation as fiduciary in drawing the check," it remains liable.  *Id.* § 5815.06; *see id.* § 5815.08.  And if the bank acted "with knowledge of such facts that its action in paying the check amounts to bad faith," it remains liable.  *Id.* § 5815.06; *see id.* § 5815.08.

The Act applies straightforwardly to the banking services that PNC provided to Antonas. That leaves the parties only to dispute whether the complaint adequately alleged that PNC acted with bad faith or actual knowledge of Antonas's misconduct.  It did not.

The complaint does not allege knowledge.  "Actual knowledge," within the meaning of the Act, refers to "awareness at the moment of the transaction that the fiduciary is defrauding the principal."  *Master Chem. Corp. v. Inkrott*, 563 N.E.2d 26, 30 (Ohio 1990).  The complaint simply lists several of Antonas's transactions, asserting that some of those transactions should have raised red flags with PNC.  What PNC should have known, however, does not matter.  *See W. Ohio Colt Racing Ass'n v. Fast*, No. 10-08-15, 2009 WL 737776, at *12 (Ohio Ct. App. Mar. 23, 2009).  The complaint simply does not support the inference that PNC knew that Antonas defrauded his investors when it assisted the transactions with these run-of-the-mine banking services.  *See Nations Title Ins. of N.Y., Inc. v. Bertram*, 746 N.E.2d 1145, 1158 (Ohio Ct. App. 2000).

The bad faith inquiry comes to the same end.  The Act's reference to "bad faith" refers to circumstances "so cogent and obvious that to remain passive would amount to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a defect in the transaction."  *Inkrott*, 563 N.E.2d at 31 (quotation omitted).  Bad faith exists when a defendant implements a general policy of declining to scrutinize a whole class of potentially unlawful transactions.  *Id.*  But the reality that a fiduciary engaged in a number, even a large number, of transactions does not suffice.  *Bertram*, 746 N.E.2d at 1154.  Neither does failure to intervene in the face of a fiduciary transferring large sums to his own company.  *Barney*, 714 F.3d at 928. Bad faith instead refers to willful refusal to act in the face of "cogent" and "obvious" indicia of misconduct.  *Inkrott*, 563 N.E.2d at 31 (quotation omitted).  To illustrate the point:  A bank's failure to intervene while a fiduciary suspiciously shifts his investors' money to "Weil Furs,"

"Golbro Jewelers," and "Cobb–Kirkland, an automobile dealership," without more, does not amount to bad faith. *Bertram*, 746 N.E.2d at 1154 (quotation omitted).

The complaint fails to point to the kind of "obvious" misconduct required to plausibly allege bad faith. *Inkrott*, 563 N.E.2d at 31. It simply collects and refers to a few unwise (in retrospect) transactions, none so "obvious[ly]" unlawful as to render PNC's inaction bad faith. *Id.* The complaint points to Antonas's transactions with "entities and individuals who were not investors in and had no relationship with" his business. R.18 ¶ 60. But a bank's inaction in the face of a fiduciary's payments to entities that appear to be uninvolved in his business does not establish bad faith. *See Bertram*, 746 N.E.2d at 1158–59. The complaint also fails to indicate what feature of the recipients of Antonas's payments would make their lack of relationship with his business "obvious." *Inkrott*, 563 N.E.2d at 31. The complaint's discussion of wire transfers to Canadian banks, cashier's checks, and cash withdrawals also does not plausibly allege bad faith. Cash withdrawals do not constitute blatant indicia of wrongdoing. *See Savin v. Cent. Tr. Co.*, 666 N.E.2d 332, 338 (Ohio Ct. App. 1995). Nothing in the complaint, in short, explains what makes these kinds of transactions "obvious[ly]" unlawful. *Inkrott*, 563 N.E.2d at 31.

The Investor Group tries to fend off this conclusion by leaning on several questionable transactions. This does not work either. In the absence of conduct sufficiently suspicious as to raise an inference of willful blindness, "[t]he mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith." *Bertram*, 746 N.E.2d at 1151 (quotation omitted).

The Investor Group highlights the complaint's allegation that Antonas transferred assets from the fiduciary account into his personal account. But the complaint identifies only $31,000 (out of more than $20,000,000) transferred in this way. A fiduciary's transfer to his own account, at all events, does not necessarily represent obvious misconduct. *See Barney*, 714 F.3d at 928.

Last and least, the Investor Group argues that Antonas's youth and inexperience nudge the complaint's otherwise inadequate allegations across the line. But nothing in the Uniform Fiduciary Act requires differential treatment of younger or less experienced fiduciaries.

*See Tsepas v. JPMorgan Chase Bank, N.A.*, No. 2016CA00177, 2017 WL 1250801, at *6 (Ohio Ct. App. Apr. 3, 2017).

B.

Even if the Uniform Fiduciary Act's affirmative defense did not bar the Investor Group's claims, the complaint would still fall short.

*Negligence*. The complaint does not allege a plausible negligence claim. As the Investor Group admits, "banks generally do not owe non-customers a duty of care" under Ohio law. Appellant's Br. 45. Ohio does not seem to make an exception when banks engage in affirmative risk-creating conduct. *See Advantage Renovations, Inc. v. Maui Sands Resort, Co.*, No. E-11-040, 2012 WL 1493826, at *7 (Ohio Ct. App. Apr. 27, 2012). Even if Ohio did recognize such an exception, the complaint would fall outside of it. The complaint alleges only that PNC failed to report Antonas's suspicious transactions, not that PNC itself created the risk to investors.

*Fraud.* The fraud allegations against PNC do not satisfy Civil Rule 9(b). The complaint omits the date on which PNC made the alleged fraudulent misrepresentation or omission. It fails to allege Koutrodimos's involvement in Antonas's fraud and does not name a single other PNC employee beyond Koutrodimos involved in the alleged fraud. It does not explain what creates a duty requiring PNC to disclose information. It refers only cursorily to what PNC should have disclosed. R.18 ¶ 111 ("[F]raudulent activities and misappropriation of funds."). And it does not allege, even in a conclusory manner, that PNC knew the identity of Antonas's investors. The complaint in the last analysis fails to put PNC on notice of what specific course of conduct the Investor Group deems fraudulent. *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614–15 (6th Cir. 2024).

Even beyond Civil Rule 9(b), the complaint faces plausibility problems. Ohio law imposes a duty to disclose "when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Warner*, 564 N.E.2d at 40 (quoting *Chiarella v. United States*, 445 U.S. 222, 228 (1980)). The complaint says that PNC knew that Antonas acted as a fiduciary of his investors but nowhere

alleges that PNC shared a special relationship with the investors. That makes sense because PNC never said or did anything to or with those investors. The Investor Group's theory, under which PNC would have a special relationship of trust and confidence with scores of unknown noncustomers who gave money to Antonas, asks too much of the doctrine. *See Schulman v. Wolske & Blue Co., L.P.A.*, 708 N.E.2d 753, 758 (Ohio Ct. App. 1998); *Chiarella*, 445 U.S. at 222–23.

The Investor Group suggests that an intermediate Ohio appellate court has indicated that a special relationship exists between accountants and "any third person to whom the accountant understands [his] reports will be shown for business purposes." *Federal Management Co.*, 738 N.E.2d at 855. The Investor Group argues that Ohio law recognizes a similar kind of reporting relationship for PNC. This argument, however, overlooks the reality that *Federal Management* declined to "extend the principles set forth" for accountants "to a fraud claim." *Id.* at 856. It also fails to appreciate the world of difference between the report recipients in *Federal Management*, a "known group possessed of vested rights, marked by a definable limit and made up of certain components," and a general group of public investors. *Id.* at 855–56 (quotation omitted).

*Civil liability for criminal acts.* The Investor Group's bid to impose civil liability on PNC for criminally aiding and abetting Antonas's fraud suffers from the same defect as the parallel claim against Koutrodimos. Ohio creates liability for aiding and abetting only for persons who acted with the shared criminal intent of the principal, *Johnson*, 754 N.E.2d at 801, and Ohio's criminal theft statute requires the principal to act with the purpose of wrongfully depriving someone of property. Ohio Rev. Code § 2913.02(A)(3). Because the complaint does not allege, much less "state with particularity," Fed. R. Civ. P. 9(b), that PNC acted with the purpose of stealing from the Investor Group, this claim also fails.

*Other causes of action.* The Investor Group rounds out the complaint with one count of aiding and abetting fraud, one count seeking to impose liability under the Uniform Fiduciary Act, and one count of civil conspiracy. All three claims fail to launch. Ohio, to repeat, does not recognize a tort for aiding and abetting fraud. *See, e.g.*, *DeVries Dairy*, 974 N.E.2d at 1194; *Sacksteder*, 2012 WL 4480695, at *16; *Smith*, 2013 WL 938069, at *7. The Uniform Fiduciary

Act gets the Investor Group no further.  Assuming without deciding that the Act creates a cause of action (another proposition by no means clear), the complaint's failure to plausibly allege bad faith or actual knowledge of wrongdoing would undercut any claim.  Civil conspiracy claims, meanwhile, cannot survive without an underlying unlawful act.  *Aetna*, 700 N.E.2d at 868.  Having dismissed the Investor Group's other claims, the district court properly dismissed its civil conspiracy claim as well.

We affirm.